**Ernest A. WALEN, Plaintiff, Appellant,**

v.

**UNITED STATES of America, Defendant, Appellee.**

**No. 5508.**

United States Court of Appeals First Circuit.

Dec. 15, 1959.

---

Bennett Sanderson, Boston, Mass., with whom Francis J. Bousquet, Boston, Mass., was on brief, for appellant.

David O. Walter, Attorney, Department of Justice, Washington, D. C., with whom Howard A. Heffron, Acting Asst. Atty. Gen., Lee A. Jackson and Harry Baum, Attorneys, Department of Justice, Washington, D. C., Anthony Julian, U. S. Atty., and Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., were on brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

ALDRICH, Circuit Judge.

This is an appeal from a decision of the district court denying recovery of an alleged overpayment of income taxes for the years 1943, 1944 and 1946. During the 1930's taxpayer and one Wilbur were employees of The Heatbath Corporation. Taxpayer and his wife owned a majority of the stock, and after June 1, 1939, Wilbur owned the balance. On May 16, 1939, taxpayer and Wilbur applied for a patent on a soluble bath composition, and a process for using it to impart a color finish to the surface of ferrous metals. On December 18, 1939, they granted the company a "license" under any patents issued on the application. Nothing in their contract of employment required this transfer. On March 5, 1940, a patent, No. 2,192,280, was issued, allowing the claims for the process, but not for the compound. Two days later the company transferred all its interest in the patent to a recently-formed successor corporation, hereinafter called Heatbath, of which taxpayer, his wife, and Wilbur owned all the stock, in the same proportions as before. During the taxable years Heatbath made certain payments, designated royalties, on account of the patent, which taxpayer now seeks to have treated as long-term capital gains rather than as ordinary income. The government does not assert that the patent was not a capital asset held more than six months, or that taxpayer is precluded from making his claim because of his stock ownership in Heatbath. See, e. g., Leonard Coplan, 1957, 28 T.C. 1189, acq., 1958–2 Cum.Bull. 4; Roy J. Champayne, 1956, 26 T.C. 634, acq., 1958–2 Cum.Bull. 4; Rev.Rul. 58–353, 1958–2 Cum.Bull. 408. Nor does it now raise any procedural matters.

The agreement of December 18, 1939, was denominated a license. After reciting that the grantors had applied for letters patent on the process, and a product to be used therefor, and that The Heatbath Corporation "is desirous of acquiring a license under any patent or patents which may be granted on said invention," it stated that taxpayer and Wilbur "hereby grant said The Heatbath Corporation a non-exclusive, non-transferable, non-revocable, and royalty free license under any patent or patents that may be granted in the United States on said application, to use and practice said invention; the above license being for the full term of any patent or patents granted on said application." The agreement further provided that taxpayer and Wilbur "will grant no further license under the aforesaid patent or patents, except with the written consent of The Heatbath Corporation."

On March 7, 1940, The Heatbath Corporation assigned to Heatbath all its right, title and interest in the license dated December 18, 1939. Thereafter Heatbath began to manufacture and sell the soluble compound under the trade name Pentrate. This compound was, as already stated, not patented, and could

be reproduced cheaply by anyone. Heatbath was able to sell it at a substantial premium, however, because it included in each package written permission to use the patented process in connection therewith. Strictly, this was a sublicense, forbidden by the "non-transferable" provision of the agreement of December 18, 1939.[1] On June 5, 1941, taxpayer and Wilbur requested Heatbath to pay them "a royalty of 6 cents per pound" on Pentrate, and a royalty on equipment sold to practice the process, as a consideration for permission to "use" the process. In this writing they recited that this "is the same basis on which we are now negotiating with other parties for use of this process * * *." Heatbath voted to accept this proposal on June 20, 1941, and the payments to taxpayer thereunder gave rise to the present litigation.

Only one of the negotiations mentioned in 1941 culminated in an agreement. In 1945 taxpayer and Wilbur granted Remington Arms Co., Inc., a non-exclusive license "to practice the process." Remington never made use of this license, and no payments were made thereunder. There is one final matter. Heatbath claimed the "royalty" payments on Pentrate as a deductible business expense (and not as depreciable acquisition cost). Taxpayer, as president of the company, attended a trial in the Tax Court involving this deduction. When asked, "Did you and Mr. Wilbur ever assign your entire rights under the * * * patent?", he testified, "Never." Heatbath's claim was allowed.

Taxpayer's present position is that Heatbath was the true owner of the patent, having acquired "all substantial rights"[2] by virtue of the license of December 18, 1939, the inter-corporate assignment of March, 1940, and the "royalty" agreement of June, 1941, and that the payments to himself and Wilbur, deducted by Heatbath as a business expense, were in reality acquisition cost. He asserts that the test must be one of substance, and not of language. His opportunistic facility in applying this principle troubled the district court. We place our decision on broader grounds.

It is true that a transaction is to be judged by its substance, and not by verbiage. Waterman v. Mackenzie, 1891, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923; Watson v. United States, 10 Cir., 1955, 222 F.2d 689, 691. Thus the fact that the purchase price has been termed "royalties," and is computed after the manner of royalties, does not necessarily mean that there was not a sale, Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 1942, 126 F.2d 406, 410; Rollman v. Commissioner, 4 Cir., 1957, 244 F.2d 634, 640–641, and an exclusive license for the life of the patent is usually regarded as a transfer of all substantial rights. This may be so held even if the transferor has retained certain limited powers, such as a right of recapture, or veto control over sub-licensing. The courts usually inquire whether such powers are designed simply to protect the transferor's interest in the continuance of the purchase payments. See Merck & Co. v. Smith, 3 Cir., 1958, 261 F.2d 162, 164–165; Rollman v. Commissioner, supra, 244 F.2d at pages 639–640; Watson v. United States, supra, 222 F.2d at pages 691–692; Allen v. Werner, 5 Cir., 1951, 190 F.2d 840, 842; cf. Watkins v. United States, 2 Cir., 1958, 252 F.2d 722, cer-

---

1. Heatbath was in the business of selling Pentrate and other equipment necessary to practice the patented process, and did not practice the process itself except for demonstration purposes. Taxpayer testified that the original intent was that after a trial period payments to taxpayer and Wilbur would be instituted.

2. The government apparently does not contend that the "sale" test under § 117(a) (4) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117(a) (4) and its predecessors, applicable to payments received in taxable years beginning prior to June 1, 1950, is any stricter than the "transfer * * * of all substantial rights" test of § 117(q) (1) of the 1939 Code, added by 70 Stat. 404 (1956), and § 1235(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1235(a), which cover taxable years beginning subsequent to May 31, 1950. We do not find it necessary to reach this question.

tiorari denied 357 U.S. 936, 78 S.Ct. 1384, 2 L.Ed.2d 1550. Taxpayer and Wilbur retained far more than this, and for a more substantial reason. Their grant to Heatbath, on its face, was non-exclusive, contemplating additional grants by them to others.

 Taxpayer cites no case in which a non-exclusive license has been held to constitute a transfer of all substantial rights.[3] Rather, he seeks to show that in spite of the statement in the license of its non-exclusive character, it was, in fact, exclusive. His only argument worthy of mention in this regard is based on the fact that taxpayer and Wilbur agreed in the license that Heatbath would be required to consent to the granting of additional licenses. The fact that Heatbath was given a veto power over such further licenses did not mean that taxpayer and Wilbur did not retain a substantial interest. Cf. Rollman v. Commissioner, supra, 244 F.2d at pages 639–640 (mere veto power in licensor over future sub-licenses by the licensee did not mean licensor had not transferred "all substantial rights"). This is particularly so here, where the document of June 5, 1941, expressly affirmed their expectation of granting such further licenses. Acceptance of this document by Heatbath was a recognition, if any was needed, that its veto power was not absolute. The fact that taxpayer and Wilbur subsequently granted a license to Remington is eloquent on this matter, even though that license turned out to be unproductive.[4] Taxpayer's contention that after June, 1941, Heatbath owned all substantial rights in the patent cannot be sustained.

Judgment will enter affirming the judgment of the District Court.

---

3. Note might be made of the case of Kavanagh v. Evans, 6 Cir., 1951, 188 F. 2d 234, 235, where taxpayer, for a fixed sum, granted a royalty-free license for the life of the patent, with full power in the licensee to grant sub-licenses, but reserved a royalty-free license to himself, with the right to transfer this from himself to "one other person." The court held the transaction a sale and not a license, observing that "it was entirely lawful for him to retain an undivided part or share of his exclusive patent rights." We do not question that a taxpayer might sell a partial interest in an invention. However, to do so it should be a transfer of a measurable, identifiable share, and not of an undefined one of elastic proportions dependent upon how many subsequent "shares" the grantor might elect to create. Whether we would agree with the actual decision in Kavanagh as a proper application of this principle is another matter. It is clear that this principle is not applicable to the facts in the case at bar.

4. In 1940, when negotiations with Remington commenced, a representaitve of Heatbath wrote that control of the patent was in Heatbath and that its written consent would be required. However, it may be noted that when taxpayer and Wilbur actually executed and delivered the license in 1945 they recited that they were "jointly the owners of the entire right, title and interest * * * [in the patent], subject only to a non-exclusive licence to Heatbath * * *," and did not even append Heatbath's consent.