E. I. du PONT de NEMOURS AND COMPANY, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 3256.

United States District Court
D. Delaware.

Feb. 14, 1969.

As Amended March 12, 1969.

James M. Tunnell, Jr. Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Karl R. Price, Ivins, Phillips & Barker, Washington, D. C., Roy A. Wentz, Jr., and John F. Palmer, Wilmington, Del., E. I. du Pont de Nemours & Co., of counsel, for plaintiff.

Alexander Greenfeld, U. S. Atty., and John P. Brady, Asst. U. S. Atty., Wilmington, Del., Mitchell Rogovin, Asst. Atty. Gen., Donald R. Anderson and Arthur L. Biggins, Attys., Dept. of Justice, Washington, D. C., for defendant.

## OPINION

CALEB M. WRIGHT, Chief Judge.

This is an action by plaintiff, E. I. du Pont de Nemours and Company (du Pont), for recovery of a portion of the internal revenue tax paid to defendant, United States of America (Government), for the calendar year 1954. Jurisdiction is based on 28 U.S.C. § 1346(a) (1); venue is based on 28 U.S.C. § 1402(a) (2). Two issues are before the Court for decision: first, whether the proceeds of an exclusive license of du Pont's Brazilian nylon patents, taxed as ordinary income in 1954, should have been treated as capital gains; secondly, whether certain legal expenses incurred by du Pont in conjunction with the reorganization of a subsidiary corporation pursuant to an anti-trust decree, taxed

as capital expenditures in 1954, should have been treated as ordinary and necessary business expenses. In view of the dissimilarity between the two issues, each will be considered separately.

## I. THE BRAZILIAN PATENTS ISSUE.

A brief summary of the terms and background of the complex transactions which constitute the substance of plaintiff's cause of action is requisite to an adequate understanding of this issue.

Du Pont is a recognized pioneer in the manufacture and development of synthetic linear polyamides, commonly known as nylon. To protect its interest in the various inventions in the nylon field, du Pont has acquired scores of patents, both domestic and foreign, covering everything from nylon to nylon intermediates to facilities, apparatus, and machinery for the manufacture of nylon. Many of these patents have, from time to time, been the subject of sale, assignment or license.

In 1951 du Pont began negotiations with a French company, Societe Rhodiaceta (Rhodiaceta), and its Brazilian subsidiary, Companhia Brasiliera Rhodiaceta (CBR), for the purpose of licensing du Pont's Brazilian nylon patents. Du Pont had dealt extensively with Rhodiaceta prior to that time regarding certain of du Pont's European patents; indeed, Rhodiaceta had been assigned all rights under those patents in 1946.[1] The 1951 negotiations continued until March, 1952 when two agreements, one with Rhodiaceta and one with CBR, were consummated.

The 1952 CBR agreement (Ex. 6) was a simple nonexclusive license agreement whereby du Pont agreed to license use of its patents in return for royalties. The true royalty was 5% of sales; however, as security for payment, CBR agreed to pay a 7% royalty, 2% of which was to be held in escrow and eventually released, not to CBR, but to its parent, Rhodiaceta.

The 1952 Rhodiaceta agreement (Ex. 5) was somewhat more complex. In return for a release from all royalties ever owing to Rhodiaceta under a 1948 agreement granting du Pont a license for the manufacture of cellulose acetate, du Pont made three commitments: First, du Pont agreed to release Rhodiaceta from its obligation to pay royalties based on French production of nlyon. Secondly, du Pont agreed to hold in escrow 2% of the royalties paid by CBR with eventual payment of the reserves to Rhodiaceta. Finally, du Pont agreed to bring up to date the technical information or know-how supplied to Rhodiaceta under the 1946 du Pont-Rhodiaceta agreement. This last provision also permitted Rhodiaceta to transmit the newly acquired know-how to CBR in the event the 1952 CBR agreement became effective.

The 1952 CBR agreement, however, did not become effective. Shortly after its execution, the Brazilian government forced its abandonment by refusing to permit CBR to enter into a royalty agreement requiring a long-term drain on Brazil's scarce dollar reserves. In addition, Brazil purportedly expressed its dissatisfaction with nonexclusive patent licenses. Transcript of Trial, September 18, 1968, pp. 52–53.

Notwithstanding the failure of the CBR agreement, the 1952 Rhodiaceta agreement, with the exception of the 2% escrow provision, became effective and the transfer to Rhodiaceta of up-to-date know-how was fully performed. Tr. 52.

Efforts to adjust the Brazilian situation to a posture acceptable to the parties and the Brazilian government commenced shortly after abandonment of the 1952 CBR agreement. A satisfactory solution was finally reached in 1954 with the execution of two new agreements. The dominant agreement (Ex. 21) was between du Pont and Rhodia-

---

1. The specific European patents assigned were du Pont's French, Belgian, Swiss, Spanish, and Luxemburg patents. Ex. 48, Art. II, p. 4.

ceta and provided that, in return for payment of $3,500,000 in United States dollars, du Pont would permit Rhodiaceta and CBR to examine its Martinsville, Virginia nlyon plant for the purpose of updating know-how and would grant an exclusive license of the Brazilian patents to Rhodiaceta on terms set forth in Article V of the agreement. Article V reads as follows:

"(a) Effective as of the date of execution by CBR of an agreement with DU PONT substantially in the form of attached Exhibit B, DU PONT hereby grants to RHODIACETA:

(1) a license under all Brazilian patents listed in * * * Exhibit A, any and all Brazilian patents issuing on the patent application listed in said Exhibit and any and all extensions or revivals of any of said patents

(i) to make, use and sell any polyamide in any form,

&ast; &ast; &ast; &ast; &ast; &ast;

(iii) to make and have made facilities, apparatus and machines and use the same, in RHODIACETA'S plants, in the manufacture of polyamide products * * *; and

(2) the right to sublicense CBR under all of the Brazilian patents licensed by section (1) of this paragraph

(i) to make, use and sell any polyamide in any form,

&ast; &ast; &ast; &ast; &ast; &ast;

(iii) to make and have made facilities, apparatus and machines and use the same, in CBR'S plants, in the manufacture of polyamide products * * *,

and to grant to CBR the right to sublicense any party under said patents to make, use and sell any polyamide in any form.

The license and right to sublicense granted by this paragraph (a) shall be exclusive except for the following non-exclusive rights reserved to DU PONT:

(a') the right under any aforesaid patent to import into Brazil and to sell and to sell for use any product lawfully manufactured in the United States * * * and

(b') the right to convey to any party a non-exclusive immunity under any aforesaid patent to import into Brazil and to sell and to sell for use any product lawfully manufactured in the United States * * * " [2]

The second 1954 agreement (Ex. 22) was between du Pont and CBR. It recited the terms of the dominant agreement relating to sublicensing and the import exceptions to the Rhodiaceta license. Consideration for the CBR agreement was $2,000,000, $250,000 of which was categorized as consideration for cancellation of the 1952 CBR agreement.[3]

The net effect of the two agreements was to transfer rights in the Brazilian patents to CBR for a consideration of $5,500,000 so that CBR could begin the manufacture of nylon in Brazil. The actual reason for the complex, three-party arrangement was apparently to avoid the international exchange problems which had occurred in 1952. Simply put, of the $5,500,000 purchase price, CBR could get $2,000,000 out of Brazil and Rhodiaceta could get $3,500,000 out of France. Because Rhodiaceta was CBR's parent, Rhodiaceta was in a position to recoup its payment to du Pont by means of internal royalty arrangements

2. Certain portions of Article V, no longer relevant to this lawsuit, have been excised.

3. The sum treated as consideration for cancellation of the 1952 CBR agreement had actually been paid to du Pont in 1952 as part of a required deposit under the terms of the 1952 agreement. Rather than return the sum to CBR when the agreement was abandoned and then have to rearrange for its release from Brazil, du Pont opted to hold the money and treat it as part of the consideration for any later agreement. It was only at the last minute that the $250,000 was classified as consideration for cancellation. Tr. 70–71, 134–35.

with CBR, so that, in the end, the intended result—purchase by CBR of patent rights for $5,500,000—would be accomplished.

The 1954 agreements were successful and du Pont received a major portion of the consideration in 1954. The amount received was reported to the tax authorities as ordinary income and taxed accordingly. However, five years later, du Pont filed a timely [4] claim for a refund urging that the proceeds from the agreements were consideration for the sale of its Brazilian patents and thus entitled to treatment as capital gains. The claim was ultimately denied and du Pont now brings this lawsuit for the refund.

The tax law applicable to a suit of this nature is reasonably simple and clear. Under § 1201(a) of the Internal Revenue Code of 1954, a reduced rate of tax is imposed on the net long-term capital gains of corporations in lieu of the tax at ordinary income rates. Under § 1222(3), "long-term capital gain" means "gain from the sale or exchange of a capital asset held for more than 6 months * * *." § 1221 defines "capital asset" and § 1231 states that depreciable property used in the taxpayer's business is equivalent to a capital asset for capital gains purposes.[5]

The Government does not dispute that the patents and patent rights involved here were either § 1221 or § 1231 assets held for more than 6 months; nor does the Government contest the applicability of §§ 1201(a) and 1222(3) in the event the Court finds that the patents involved here were sold. The Government does contest, however, the allegation that the 1954 agreements in fact constituted a sale of the Brazilian patents. And, further, the Government contends that, even if the 1954 transactions did involve a sale of the patents, part of the consideration paid was not for that sale but for additional items—

know-how and cancellation of the prior CBR agreement—not entitled to capital gains treatment.

## A. SALE OF BRAZILIAN PATENTS

Considering first the issue of whether the 1954 agreements involved a sale of patents, both parties agree that the standard applied by the Court of Appeals in Merck & Co., Inc. v. Smith, 261 F.2d 162 (3 Cir. 1958)—the "all substantial rights" test—properly governs this suit.

Briefly stated:

"* * * a transfer of all the substantial rights in a patent is deemed an assignment and qualifies the transferor for capital gains treatment. A transfer of anything less is called a license with a resultant assessment of the tax at ordinary income rates." 261 F.2d at 164.

Failure to designate a transaction a "sale" or "assignment" is not determinative. See Waterman v. Mackenzie, 138 U.S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923 (1891); Merck & Co., Inc. v. Smith, supra, 261 F.2d at 164. Rather, the pertinent inquiry is whether the rights, if any, retained by the grantor in either the complete patents or any separate and identifiable portion of the patents transferred are substantial enough to warrant the conclusion that the grantor has not, in fact, divested himself of an asset. See United States v. Carruthers, 219 F.2d 21 (9 Cir. 1955); First National Bank of Princeton v. United States, 136 F.Supp 818, 824 (D.N.J. 1955).

It is the Government's position that three substantial rights were retained by du Pont in the 1954 transactions—the right to import and to license others to import nylon into Brazil, the complete rights to the patents in all fields except

4. The statute of limitations was extended by agreement of the parties. See Stipulation of Facts, ¶ 4 (Stip. 4).

5. § 1235 of the Internal Revenue Code of 1954 deals directly with the sale of patent rights; however, § 1235 applies only to sales by individuals and not to sales by corporations.

nylon,[6] and the right to sell and sublicense facilities, apparatus, and machinery for manufacturing nylon—and that these three reservations, considered separately or together, are sufficient to warrant denial of capital gains treatment. Each of these three retained rights will be considered separately.

### 1. Right to Import.

The right to import nylon into Brazil and to license others to do the same is reserved to du Pont in Article V of the 1954 Rhodiaceta agreement and Article III of the 1954 CBR agreement. Du Pont argues, however, that the reserved right cannot qualify as substantial and that the reservation was made, not for commercial reasons, but pursuant to a requirement of the anti-trust decree entered by a federal court against du Pont in 1952. The Government denies the relevance of the anti-trust decree and, of course, argues that the reservation is indeed substantial.

The Court does not reach the issue of whether a compulsory reservation may preclude capital gains treatment of a patent transfer, because the Court finds the value of the import reservation to be insubstantial.

█ In determining substantiality of a retained right, the Court must look to the value of the reservation at the time it was made. Subsequent events should only be considered for the limited purpose of confirming or impeaching testimony of expectations as of the valuation date. See Lincoln Rochester Trust Co. v. McGowan, 217 F.2d 287, 293 (2 Cir. 1954). Here, the evidence is clear that, owing to the practice of the Brazilian government to forbid competition from foreign suppliers once a domestic organization begins production, see Stip. 22; Ex. 25–27, the parties to the 1954 transactions considered the import reservation

inconsequential. Indeed, Rhodiaceta's chief negotiator for the 1954 agreements, Picard, testified:

"Q. When Du Pont brought it up, was there any bargaining between the parties with respect to the value of this reservation?

"A. No, not particularly. The point was not of great concern to us. * * we discussed it but we didn't go to any real hard discussion because we knew that for a practical matter it meant really nothing because we knew from past experience that the policy of the Brazilian Government * * * is that once you start manufacturing activity you have complete protection from your own Government. So we knew that no real imports could be carried out after we would have been in business." Tr. 61–62.

Internal memoranda of du Pont also reflect this position. Ex. 7, 8. Thus, the only apparent reason for the reservation was du Pont's feeling that the anti-trust decree mentioned above required it. Tr. 61, 141–42.

Statistics relating to volume of imports into Brazil after 1954, see Stip. 18–19, tend to confirm the effects of Brazilian policy on foreign competition and reinforce du Pont's judgment that, once CBR began nylon production, imports would fall drastically. CBR began production in late 1955, Tr. 61, and du Pont's imports that year dropped to one-quarter the level of the previous year. By 1959, du Pont's imports were virtually non-existent. Stip. 18. Figures for imports from all United States producers reflect the same trend. Stip. 19.

█ Accordingly, the Court finds that reservation of the import right is not grounds for denying capital gains treatment of the proceeds of the 1954 transactions.

---

6. The record indicates only one field of application other than the manufacture of nylon, namely, the manufacture of synthetic linear polyesters (marketed by du Pont under the tradename "Dacron"). Accordingly, the Court will treat this particular reservation as the reservation of all Dacron rights.

## 2. Limitation to Nylon Field.

The record is clear, and the parties do not dispute, that several of the patents transferred in 1954 have applications outside the field of nylon production. Specifically, four of the eight patents transferred have applicability to the manufacture of synthetic polyester fibers, i. e., Dacron. It is also a matter of record that the 1954 agreements limit Rhodiaceta's and CBR's use of those patents to production of nylon, thus reserving all Dacron rights to du Pont. The parties do not agree, however, on the significance of the Dacron reservation as it relates to this action.

Du Pont contends that, while the four patents do indeed have some application to the production of Dacron, that application is very limited and in no way essential to the manufacture of Dacron. Du Pont also asserts that, even assuming a substantial value to the reserved Dacron rights, nylon and Dacron are two completely distinct fibers and the relevant patents are thus divisible along product or industry lines. The Government, on the other hand, denies the insignificance of these patents with regard to Dacron production and asserts the substantiality of the patent rights retained by du Pont in this field. In addition, the Government asserts that the four patents are not divisible along the line suggested by du Pont.

Considering first the significance of the four patents to production of Dacron, the record is replete with testimony of experts that "as far as [Dacron] was concerned, they were very unimportant patents." Tr. 182. See also Tr. 219–220. The primary basis for this analysis is that, because another Brazilian patent —the Whitfield and Dixon patent—covers the entire field covered by the du Pont patents, the du Pont patents are not essential to the manufacture of Dacron.[7] Tr. 219–220. In addition, because the licensee under the Whitfield and

Dixon patent had, in 1954, already begun production of polyester fibers in Brazil, manufacture of polyester fibers by any other party under the du Pont patents was barred. Tr. 193, 218.

The Government responds to this evidence by citing instances where du Pont itself has allegedly affirmed the substantial value of the Brazilian Dacron rights. The first such instance is the 1946 negotiations between du Pont and Rhodiaceta where du Pont assigned a significantly higher value to a transfer of all right, title and interest to its European patents than to a transfer of an exclusive license in the nylon field alone. Tr. 83–85, 89. The second instance is the testimony of du Pont's president in the 1952 antitrust proceedings that du Pont would be willing to grant a license under its basic nylon patents and that such a license would provide substantially everything necessary for production of both polyamides and polyesters. Government's Brief, p. 15; Ex. G.J.–1, p. 13.

The Government's response is not convincing. As to the 1946 negotiations, there is no basis on which the Court can conclude that the terms applied to disposition of the subject European patents were applicable in 1954 to du Pont's Brazilian patents, especially in view of the situation in Brazil with regard to the Whitfield and Dixon patent. Nor is there any basis for concluding that judgments as to the value of a given patent in the Dacron field in 1946 were valid eight years later in light of significant developments in Dacron technology. See Tr. 216–217. As to the 1952 statement of du Pont's president, there is again no evidence to suggest that the speaker had in mind the Brazilian patents or the bar to Dacron production in Brazil in 1954.

■ Accordingly, the Government's evidence is insufficient to overcome the showing by du Pont that limitation of the patents transferred to the production

7. The record indicates that no competitor of du Pont in the Dacron field uses the du Pont patents, Tr. 192, and that the licensee under the Whitfield and Dixon patent has never sought a license from du Pont. Tr. 219.

of nylon is not the reservation of a substantial right in the patents.

■ However, even if the Court is wrong in its conclusion and the Dacron reservation does in fact have significant value, the Court is of the opinion that the patents involved are nonetheless divisible along the line between nylon and Dacron and that the sale of substantially all nylon rights is entitled to capital gains treatment.

The law is well-settled that the sale of a partial interest in a patent may qualify for capital gains treatment:

" * * * it has been held that for capital gains purposes the patent grant may be separated into different fields of application and each field transferred to a different transferee, with each transfer qualifying separately as a sale. Rouverol, 42 T.C. 186 (1964). To like effect, capital gain treatment has been allowed for a transfer limited to one industrial use only, First National Bank of Princeton v. United States, 136 F.Supp. 818, 823-824 (D. N.J.1955); for a transfer of only one of the claims in the general patent, Merck & Co. v. Smith, 261 F.2d 162 (3rd Cir. 1958); and for a transfer limiting the use of the patent to a particular territory or industry. United States v. Carruthers, 219 F.2d 21 (9th Cir. 1955); * * *."

Bell Intercontinental Corporation v. United States, 381 F.2d 1004, 1014-1015, 180 Ct.Cl. 1071 (1967).

The Government contests divisibility in this case on two separate grounds. First, the Government argues that, while a patent may be divisible along product, industry, or territorial lines, that is only so when the patent consists of more than one claim or invention. In other words, single invention patents cannot be divided notwithstanding the fact that they

have applications to more than one product or industry. The four patents involved here are admittedly single invention patents[8] and thus, the argument goes, they are not divisible.

The Government would draw support for this proposition from Merck & Co., Inc. v. Smith, supra. In Merck, the court held that the sale of one of several claims in a generic patent for sulfa drugs was entitled to capital gains treatment, i. e., that the patent involved was properly divisible into separate inventions. However, the court did not hold, as the Government suggests, that only multiple invention patents are divisible. Indeed, the court noted, 261 F.2d at 165, that:

"One who owns a single invention patent may 'sell' its use in a particular territory or industry, United States v. Carruthers, 9 Cir., 1955, 219 F.2d 21, or for one industrial use only, First National Bank of Princeton v. United States, D.C.D.N.J.1955, 136 F.Supp. 818, 823-824."

The First National Bank of Princeton case is particularly interesting in this regard. There, a single invention patent covering a method for rounding the ends of brush bristles was sold with the limitation that its use be confined to the toothbrush industry. The right to use the invention on other kinds of brushes was retained. The court allowed capital gains treatment of the sale proceeds notwithstanding the reservation.

Estate of Milton P. Laurent, 34 T.C. 385 (1960) also deserves mention. There, a patent covering the single invention of a closure joint with an improved seal was licensed according to the following provision:

"The license granted herein is nonexclusive as to the entire invention, but is exclusive in so far as the invention can be applied to gate valves * * *"

8. Two of the four patents in issue here cover both process and apparatus inventions so that, in one sense, they are not single invention patents. However, because every portion of these two patents relating to nylon also relates to Dacron, a division along nylon-Dacron lines is not a division between separate inventions and thus the patents may still be considered single invention patents for purposes of analysis.

Gate valves being a specific and identifiable product within the valve industry, the court held that the proceeds attributable to the exclusive portion of the agreement were entitled to capital gains. See also Rouverol v. Commissioner of Internal Revenue, 42 T.C. 186 (1964); United States v. Carruthers, supra.

In light of these several cases, the Government's first contention must be rejected.

The Government's second contention is that, even granting divisibility of a single invention, nylon and polyester fibers are both synthetic fibers produced by the synthetic fiber industry. Thus, there is no basis for division of the patents along either product or industry lines.

■ There is no merit to this contention. The keystone of divisibility is not whether the line is drawn between "products" or "industries" in the broad, generic sense, but whether the patent or invention is divided into measurable, identifiable categories. See Laurent, supra 34 T.C. at 390; Walen v. United States, 273 F.2d 599, 602 n. 3 (1st Cir. 1959) (dicta). Here, nylon and Dacron are clearly two separate, identifiable products. Their properties are significantly dissimilar, the raw materials used in the manufacture of each are different, the processes used in their manufacture vary in some respects,[9] and different equipment is required to produce each. See Tr. 230–232. In light of this, there can be no question that division of an invention on the line between nylon and Dacron is entirely appropriate. See United States v. Carruthers, supra;

First National Bank of Princeton v. United States, supra; Laurent, supra.

Capital gains treatment, therefore, cannot be denied on the basis of the limitation to the manufacture of nylon.

### 3. Right to Sell and Sublicense Equipment.

Four of the eight patents transferred in 1954 were both process and apparatus patents. A careful reading of Article V of the 1954 Rhodiaceta agreement and Article III of the 1954 CBR agreement, however, reveals that, while both grantees received the right to make and use, in their own plants, the facilities, apparatus and machinery (equipment) covered by the patents, neither could sell such equipment. In addition, while CBR, under its sublicense from Rhodiaceta, could in turn sublicense others to make, use and sell nylon, it could not sublicense others to make and use the requisite equipment. Thus, while CBR could authorize another company to make nylon, it could not permit that company to make or use the equipment covered by the patents and neither could it (or Rhodiaceta) sell such equipment to that company.[10]

Considering these restrictions as they relate to Rhodiaceta, the only limitation on Rhodiaceta is the inability to sell equipment. That limitation does not concern the Court because the manufacture of equipment for sale to other fiber producers is a function separate and distinct from manufacture of equipment for use in one's own fiber production. Accordingly, the apparatus patents in issue here are divisible along that line. See discussion of divisibility above, Section I, A, 2.

9. To the extent that the du Pont patents apply, the manufacturing processes are, of course, identical. However, "these patents are applicable only to a minor part of polyester production," Tr. 220, and in the areas where they do not apply, the processes apparently differ. Tr. 230.

10. At oral argument, counsel for du Pont urged a construction of the agreements which would permit CBR to sublicense making and use of equipment. See Transcript of Argument, December 27, 1968, pp. 87–91. While the face of the agreements will not permit such a reading, counsel's argument has some plausibility considering the circumstances surrounding execution of the agreements. However, in light of the Court's disposition of this matter, there is no need to rule finally on the construction urged.

Considering the restrictions as they relate to CBR, however, the impact is much broader. CBR can, of course, neither sublicense the making and use of equipment nor sell equipment. Thus, CBR's ability to sublicense the production, use and sale of nylon is meaningful only if du Pont agrees to sell CBR's proposed sublicensees the equipment requisite to production.[11] Thus, du Pont has not only withheld the right to sublicense the making and use of equipment but has in addition reserved to itself, in effect, a veto power over CBR's ability to sublicense production, use and sale of nylon. In these two respects, the Government argues, du Pont has reserved substantial rights in the patents.

The inability to sublicense making and use of equipment, considered by itself, is not a sufficient ground for concluding that no sale has occurred. Du Pont having granted an exclusive license in the 1954 transaction, there is no basis for du Pont's exercise of the power to sublicense. Thus, while du Pont has withheld from CBR a right under the patents, it has nonetheless failed to retain for itself anything of value. See Norgren v. United States, 268 F.Supp. 816, 821 (D.Colo.1967) (" * * * the question is not what rights [assignee] *received*, but what rights were *relinquished* by the taxpayer.")

Du Pont's veto power over CBR's ability to sublicense the production of nylon poses a more difficult problem. After careful consideration, however, the Court is convinced that the weight of authority is on the side of permitting capital gains treatment notwithstanding limitations on the ability to sublicense. The rationale for this conclusion is amply articulated in Bell Intercontinental Corp. v. United States, supra:

"That the original agreement did not transfer to [assignee] the right to sublicense others is without significance for such a limitation 'does not inter-

fere with the full use of the patent by the assignee * * * [and] the assignor retains no use of the patent for himself by reason of the limitation since he has granted the exclusive rights to assignee * * *.' Rollman v. Commissioner, 244 F.2d 634, 640 (4th Cir. 1957)." 381 F.2d at 1017.

Here, the limitations on the right to sublicense do not interfere with CBR's full use of the patent for itself. Accordingly, the limitations are not sufficient to block capital gains treatment.

■ No substantial rights in the eight patents transferred having been retained, the 1954 transactions constituted a sale of those patents, the proceeds of which are entitled to capital gains treatment.

## B. PORTION OF THE PROCEEDS ENTITLED TO CAPITAL GAINS TREATMENT.

Accepting as a fact that the 1954 transactions did constitute a sale of du Pont's Brazilian patents, the Government argues that the entire proceeds of the transactions—$5,500,000—are not attributable to the sale. Specifically, the Government alleges that $2,000,000 of the total is in fact consideration for the transfer of know-how to Rhodiaceta and CBR in 1952; that $250,000 is consideration for transfer of know-how in 1954; and that $250,000 is consideration for cancellation of the 1952 CBR agreement. In each of these three instances, the contention goes, capital gains treatment is not appropriate and thus only $3,000,000 of the total represents capital gains.

### 1. 1952 Know-how.

The 1952 Rhodiaceta agreement, discussed in detail above, provided for transfer by du Pont to Rhodiaceta of up-to-date know-how in return for a release of du Pont's royalty obligations under a 1948 agreement. The agreement also provided that, in the event of an effec-

11. The availability of such equipment from sources other than du Pont is not a matter of record in these proceedings.

Accordingly, the Court will assume that du Pont, by itself or through a licensee, is the only source of this equipment.

tive agreement between du Pont and CBR, Rhodiaceta could transmit the current know-how to CBR without incurring an obligation to pay du Pont a royalty based on CBR's use of that know-how. Ex. 5, Article VI.

The 1952 CBR agreement never became effective and Rhodiaceta could not benefit from transmittal of know-how to CBR. Thus, the Government argues, there was a partial failure of consideration under the 1952 Rhodiaceta agreement. However, in 1954 when Rhodiaceta was finally able to pass the know-how on to CBR, the failure was remedied and, at that point, consideration for the know-how transmitted to CBR must have been paid. The Government estimates the payment at $2,000,000.

The Court cannot accept the Government's argument. The 1952 Rhodiaceta agreement, as it related to know-how, was, in the Court's opinion, fully performed. While Rhodiaceta was not able to transmit know-how to CBR in 1952, it nonetheless must have paid for the right to make such a transmittal in the future, for when the 1952 CBR agreement failed, no reduction was made in consideration paid by Rhodiaceta. And when the 1953–54 negotiations reached their conclusion, no mention had ever been made of any obligation to pay further for the 1952 know-how. Tr. 63. Indeed, when the 1954 agreements were consummated, no consideration toward any such obligation was ever recited. Had there in fact been a further obligation to pay for 1952 know-how, surely Rhodiaceta or CBR would have demanded a statement that the obligation had been satisfied.

■ Accordingly, the Court concludes that the 1952 know-how and the right to transmit it to CBR were fully paid for under the 1952 Rhodiaceta agreement.

### 2. 1954 Know-how.

There is no dispute that the 1954 Rhodiaceta agreement provided that rep-resentatives of Rhodiaceta and CBR could visit du Pont's Martinsville, Virginia nylon plant. Since Rhodiaceta had toured the same plant in 1952, the apparent purpose of the provision was to bring the assignees up-to-date on developments at Martinsville between 1952 and 1954. The visit was accomplished in 1954 and the Government contends that a portion of the total proceeds must be assigned to the know-how obtained on that visit. The Government assigns a value of $250,-000 to the know-how and asserts that that sum is not properly considered capital gains.

■ In no event can this Court agree with the Government's valuation of $250,000 in light of the wealth of testimony exposing the insignificance of the Martinsville visit. See Tr. 63–69, 74, 205–209, 223–227. However, even assuming that the visit resulted in acquisition of know-how with some relevance to the successful manufacture of nylon under the patents, the Court, in view of The Heil Co. v. Commissioner, 38 T.C. 989 (1962), cannot accept the position that proceeds from sale of that know-how are not entitled to treatment as capital gains. The holding of Heil is clear:

"Concededly the patents here involved were long-term capital assets and were sold. The contract under which they were transferred by way of sale likewise provided for the transfer of the engineering and manufacturing information, or know-how, pertinent and necessary to the successful manufacture of products under the patents. In such situation the information, or know-how, was an incident of the patents, took on the nature of such property, and constituted a long-term capital asset that also was sold." 38 T.C. at 1003.

While not bound by decisional law of the Tax Court, this Court is disposed to follow the sound logic of that Court in this matter.

3. Cancellation of the 1952 CBR Agreement.

Article V(a) of the 1954 CBR agreement states:

"In consideration of the cancellation of the aforesaid agreement of March 20, 1952 CBR * * * waives any claim it may have to the sum of [$250,-000] heretofore paid to DU PONT pursuant to section (1) of paragraph (a) of Article III of said agreement." The Government contends that this sum should be treated as ordinary income.

If one looks at the form of Article V(a), the Government's argument is compelling. However, consideration of the substance of that Article indicates that a different result must be reached.

The 1952 CBR agreement was a nonexclusive license agreement permitting CBR to manufacture, use and sell nylon in Brazil under du Pont's patents. The 1954 agreement, on the other hand, was a sale of those patents to CBR. Thus, by necessity, the 1954 agreement cancelled the 1952 agreement,[12] the same way assignment of a primary lease to a sublessee automatically terminates the sub-lease. Notwithstanding the fact that consideration is cited for cancellation, the substance of the transaction is the sale of capital assets and the proceeds should be treated accordingly.

The reasoning of the Tax Court in Samuel D. Miller v. Commissioner, 48 T.C. 649 (1967), supports the Court's conclusion. In Miller, the lessee under a prime lease of business property assigned his entire leasehold interest to his sublessee, the purpose of the transfer obviously being the disposal of the leasehold interest. The parties, however, executed two separate documents, one purporting to cancel the sublease and the second assigning the primary lease and consideration was recited for both agreements. 48 T.C. at 650–651. The Tax Court held

that the entire consideration was to be treated as the proceeds from the sale of income-producing property:

"* * * the substance of the transaction was the acquisition of petitioner's leasehold interest which still had many years to run. By assignment thereof to [sublessee] petitioner disposed of his entire interest in the property and the fact that the sublessee provided the consideration therefor and entered into an agreement to cancel the sublease does not alter the inescapable conclusion that a sale of income-producing property occurred. The assignment of the prime lease, not the cancellation of the sublease, effected the business purpose of the parties. * * *

*     *     *     *     *     *

"We place little importance on the fact that the sublease cancellation and the prime lease assignment were effected by separate documents with the $32,-000 payment termed consideration for the sublease cancellation. Both of the documents were executed on the same day and we view them as unified components of the same transaction. We are concerned with the substance not the form. The sublease cancellation was merely supplementary to the attainment of [sublessee's] business objective." 48 T.C. at 653, 654.

The testimony of du Pont's witnesses that the cancellation provision was requested and entered at the very last minute by CBR in order to avoid a complication under the Brazilian seal tax and that the $250,000 indeed had nothing to do with cancellation of the 1952 agreement also lends support to the result arrived at here. See Tr. 70–71, 134–135.

In light of the foregoing, the entire proceeds from the 1954 transactions are entitled to treatment as gains from the sale of capital assets held for more than 6 months.

12. The Court assumes for purposes of analysis that the 1952 agreement had not legally expired at the time Article V(a) of the 1954 CBR agreement was executed. The Government, of course, makes the same assumption in its argument.

## II. LEGAL EXPENSE ISSUE.

The facts underlying the issue of deductibility of certain legal expenses arising from formulation of a plan for compliance with an adverse anti-trust decree are not in dispute. Prior to 1952, du Pont and Imperial Chemical Industries Limited (ICI), a British company, each held a 42% interest in Canadian Industries Limited (CIL), a Canadian corporation, the remaining interest being owned by public shareholders. On July 30, 1952, the United States District Court for the Southern District of New York entered a final judgment in an anti-trust proceeding against du Pont and ICI requiring that the joint interest in CIL be terminated. See Ex. 29. Under the terms of the judgment, termination could be accomplished in any one of four ways, one alternative being the physical segregation of the CIL assets between du Pont and ICI. For reasons not relevant here, du Pont and ICI agreed to proceed according to the segregation alternative, and the two parties prepared a plan for the division of CIL. The plan was approved by the New York District Court in January, 1954 and division was consummated on July 1, 1954.

The terms of the division are complex. Briefly, however, the result was the transfer of all CIL business to two new corporations, Canadian Industries (1954) Limited (CIL 54)—ICI's half—and Dupont Company of Canada Limited (Dupont of Canada)—du Pont's half—each new corporation supposedly having equal earning power. Formation of CIL 54 was accomplished by an exchange of CIL common and preferred stock for CIL 54 common and preferred. However, Dupont of Canada was formed as a wholly-owned subsidiary of CIL (renamed Dupont of Canada Securities Limited (DCSL)) and the capital structure of DCSL was rearranged to increase public ownership by 10% and to increase preferred dividends. This holding company—subsidiary arrangement was designed to insure minimum tax liability and maximum compliance with Canadian law.

During 1954, du Pont incurred a liability of $121,329 to three law firms for assistance in developing and carrying out the segregation plan. Du Pont claimed this amount as ordinary and necessary business expenses pursuant to § 162(a) of the Internal Revenue Code of 1954. The Internal Revenue Service disallowed the deduction on the ground that the expenditures were capital expenditures in connection with the reorganization of du Pont's Canadian interests and thus, under § 263(a) of the Internal Revenue Code, non-deductible. Du Pont now sues for a refund of the tax paid in 1954 on account of the disallowance of its deduction.

The line between "ordinary and necessary expenses paid or incurred * * in carrying on any trade or business * * *," § 162(a), and "amount[s] paid out for * * * permanent improvements or betterments made to increase the value of any property * * *," § 263(a), is often a fine one discernible only after cautious analysis of the substance of the questioned transactions. In the instant case, the Government views the substance of the transactions in issue here as expenditures incurred in the reorganization of du Pont's Canadian business interests. And, the Government argues, expenses of corporate reorganization are non-deductible capital expenditures. Du Pont, on the other hand, views the transactions as expenditures incurred for the purpose of preserving and protecting existing assets in light of the anti-trust decree pending against it. Such expenditures, du Pont argues, are deductible under § 162(a).

After careful review of the record, the Court is of the opinion that du Pont's view of the legal expenditures is the appropriate one. While, in one sense, the result accomplished under the 1954 plan was a reorganization of CIL, it was not a change in corporate structure made "for the benefit of future operations." Mills Estate v. Commis-

sioner, 206 F.2d 244, 246 (2d Cir. 1953). Indeed, there is no basis in fact for the conclusion that the CIL transformation was in any way intended to enhance the profitability or efficiency of du Pont's investment in the Candian operations. Indeed, the increase in public ownership, the increase in the dividend rate, and the use of the holding company arrangement make it evident that no enhancement was intended or expected. See Tr. 249. Accordingly, the only reasonable conclusion must be that du Pont's efforts and expenditures in 1954 were aimed at conservation and protection of its existing Canadian investment with the least possible harm in light of the anti-trust mandate which du Pont faced.

In reaching this conclusion, the Court does not give consideration to the involuntary nature of du Pont's expenditure. Indeed, whether the expenditure is voluntary or compulsory is irrelevant. See Woolrich Woolen Mills v. United States, 289 F.2d 444, 448 (3rd Cir. 1961). The important focus is rather on the end result of the expenditure, not its cause. Here, the end result of du Pont's legal expenditures was the rearrangement of its Canadian assets in a manner which would simply permit du Pont to continue using its Canadian investment without enhancing the quality or value of that investment in any significant way. In light of this, du Pont is entitled to deduct the legal expenses incurred in achieving this result. See United States v. General Bancshares Corp., 388 F.2d 184, 191–192 (8th Cir. 1968).

## III. CONCLUSION.

Du Pont is entitled to capital gains treatment of the entire amount received in 1954 pursuant to the sale of its Brazilian nylon patents to Rhodiaceta and CBR. Excess taxes paid on account of the treatment of these proceeds as ordinary income must be refunded (plus interest).

Du Pont is entitled to a deduction of the legal expenses incurred in 1954 pur-

suant to formulation of a plan for segregation of CIL assets as an ordinary and necessary business expense for the year 1954. Excess taxes paid on account of the disallowance of this deduction must be refunded (plus interest).

The foregoing opinion is adopted as the Court's Findings of Fact and Conclusions of Law in accordance with F.R. Civ.P. 52(a), 28 U.S.C.A.

Submit order in accordance herewith.