## ALLEN G. EICKMEYER AND MARJORIE L. EICKMEYER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6756-73.     Filed April 19, 1976.

*A. Glenn Sowders, Jr.,* for the petitioners.
*George T. Morse III,* for the respondent.

FORRESTER, *Judge:* [*] Respondent has determined deficiencies in petitioners'[1] income tax for taxable years 1968, 1969, and 1970 in the following amounts:

| | |
|---|---|
| 1968 | $48,148.43 |
| 1969 | 115,363.38 |
| 1970 | 92,842.58 |

Concessions having been made, the only issue remaining for our decision is whether, pursuant to eight separate agreements concerning use of his "Catacarb Process," the amounts received by petitioner constitute ordinary income or whether such amounts should be characterized as long-term capital gain under section 1235.[2]

---

[*] This case was submitted for adjudication under Rule 122, Tax Court Rules of Practice and Procedure. By order of the Chief Judge, dated June 12, 1975, this case was assigned to Judge Bruce M. Forrester for disposition.

[1] Petitioner Marjorie L. Eickmeyer is a party solely as a cosigner of a joint return with her husband, Allen G. Eickmeyer. Hereinafter, reference to the petitioner shall refer to Allen G. Eickmeyer.

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

### FINDINGS OF FACT

All of the facts have been stipulated and are so found.

Petitioners Allen G. and Marjorie L. Eickmeyer were residents of Prairie Village, Kans., at the time the petition herein was filed. Petitioner filed his 1968 and 1970 income tax return with the District Director, Austin, Tex. There is no indication in the record as to where he filed his 1969 return.

Petitioner is an engineer by profession and, during the years 1968, 1969, and 1970, he operated a sole proprietorship under the name of Eickmeyer & Associates using the cash basis method of accounting.

At least as early as 1960, petitioner began work on a process (hereinafter referred to as the Catacarb Process) for the removal of acid gases, such as carbon dioxide and hydrogen sulfide, from gaseous mixtures. The Catacarb Process has wide application in the oil refining, petrochemical, and fertilizer processing industries.

As early as 1962, petitioner filed a patent application with the United States Patent Office covering the Catacarb Process. From 1962 to 1971, petitioner filed a series of patent applications covering said process and, on November 26, 1974, a copy of letters patent No. 3,851,041 covering the Catacarb Process was issued to petitioner. Petitioner is the only record holder of an interest in the patent applications filed between 1962 and 1971, and is the only record owner of the letters patent issued November 26, 1974.

Between January 1, 1960, and December 31, 1970, petitioner entered into 12 separate agreements with unrelated business entities concerning the use of the Catacarb Process. Payments received pursuant to these agreements inured solely to the benefit of petitioner. However, under only 8 of these 12 agreements did petitioner receive any payments during the years at issue.

For purposes of the instant case, the eight contracts at issue can appropriately be divided in two groups: three contracts executed prior to 1968,[3] and five contracts executed after that year.[4]

---

[3] The three pre-1968 contracts were entered into between petitioner and Atlantic Richfield Co., Bechtel Corp., and Sun Oil Co. Petitioner has attached to his brief an undated document purporting to clarify the 1967 contract with Sun Oil Co. This document was not stipulated into evidence by the parties and, thus, does not constitute admissible evidence in the instant case. Rules 122 and 143, Tax Court Rules of Practice and Procedure.

[4] The five post-1968 contracts were entered into between petitioner and Chemical Con-

Each of the three pre-1968 contracts provide that petitioner, in consideration for a specified fee, grants an "exclusive license" in the Catacarb Process to the transferee corporations. In two of these contracts (Bechtel Corp. and Sun Oil Co.) the term "exclusive license" is defined as, "the sale and transfer of an irrevocable, undivided interest in the complete Catacarb Process and Patent Rights." In the third contract (Atlantic Richfield Co.), the term is defined as "the sale and transfer of an irrevocable undivided interest to make, use and sell the complete process defined by Letters Patent and/or patent applications."

In each of the three contracts, the terms "license" and "license fee" are used to characterize the rights granted therein and the fees paid therefor.

None of these contracts specifically reserve to petitioner the right to make, use, or sell the patent rights to the Catacarb Process. In each, the patent rights transferred thereunder extend for 10 years or for the life of the patent, whichever period is longer.

None of the contracts restrict the transferees' patent rights to any geographical area nor do they limit such rights to particular fields of use within certain trades or industries.

None of the contracts reserve to petitioner the right to sue third parties for infringement of the patent, and none provide that petitioner has the right to terminate the transfer at will, or for any reason.

Two of the three contracts (Atlantic Richfield Co. and Sun Oil Co.) are silent as to the rights of the respective transferees to sublicense or subassign the patent rights granted thereunder. The third (Bechtel Corp.), however, provides that the transferee can sublicense if the transferee (1) notifies petitioner and (2) pays and accounts to petitioner "for all royalties herein provided."

The five post-1968 contracts are, in many respects, quite similar to those executed prior to that year. However, certain differences merit discussion.

The post-1968 contracts do not refer to the granting of a "license" nor do they characterize the payments to petitioner as "license fees." Instead, these documents generally use ter-

---

struction Corp., Dawood Hercules Chemicals Ltd., J. F. Pritchard & Co., the M. W. Kellogg Co., and Tenneco Oil Co.

minology more associated with the "assignment" of patent rights, such as "assignee," "owner," and "purchase price."

Four of the five contracts either clearly provide or imply that the transferee may sublicense or subassign its rights to the Catacarb Process, and the fifth (Dawood Hercules Chemicals Ltd.) contains no statement to the contrary.

Four of the contracts provide that the agreement can be terminated by petitioner if the transferee corporation is in default on any obligations under the contract. The contract with Tenneco Oil Co., however, contains no such provision.

Three of the five contracts are silent as to the right of the transferee to sue third parties for infringement of the patent, but the contracts with J. F. Pritchard & Co. and the M. W. Kellogg Co. specifically state that these companies may sue for infringement in their own name.

All five of the post-1968 contracts provide that, in consideration of the payments specified therein, petitioner "hereby sells an undivided 1% interest in the Patent Rights," such rights to extend for the life of the patent.

OPINION

The issue in the instant case involves the proper characterization of the amounts received by petitioner during the years at issue pursuant to the eight contracts discussed, *supra.* Petitioner contends that such amounts should be characterized as long-term capital gain under section 1235. Respondent argues that section 1235 is not applicable and that the amounts received by petitioner should be treated as ordinary income.

Section 1235[5] provides that, under certain conditions, a transfer of "all substantial rights" to a patent (or an undivided interest therein which includes a part of all such rights) will result in long-term capital gain to the transferor. An "undivided interest" in all substantial rights to a patent is defined in the regulations as the ownership of the same fractional share of each

---

[5] SEC. 1235. SALE OR EXCHANGE OF PATENTS.

(a) GENERAL.—A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are—

(1) payable periodically over a period generally coterminous with the transferee's use of the patent, or

(2) contingent on the productivity, use, or disposition of the property transferred.

and every substantial right. Sec. 1.1235-2(c), Income Tax Regs.[6]

In the three pre-1968 contracts, petitioner received payments in return for transferring an "undivided interest" in the patent rights to the Catacarb Process. In the five post-1968 contracts the payments were in consideration of transferring an "undivided 1% interest" in the patent rights.

Although the capital gains benefits of section 1235 pertain to a transfer of an "undivided interest" in patent rights, respondent argues that, looking at all the circumstances of each transaction, section 1235 is not applicable because petitioner failed to transfer an undivided interest which included "all substantial rights" to the Catacarb Process. We disagree and hold for petitioner.

The question of whether all substantial rights to a patent have been transferred is generally resolved by examining the substantiality of the rights, if any, that the transferor has retained. *Donald C. MacDonald,* 55 T.C. 840, 859 (1971); *Taylor-Winfield Corp.,* 57 T.C. 205, 219 (1971).

In his regulations pertaining to section 1235, respondent has specified certain limited or incomplete transfers which respondent regards as transfers of less than "all substantial rights." Sec. 1.1235-2(b)(1) and (4), Income Tax Regs.[7] Respondent also sets forth certain rights which, if retained by the

---

[6] Sec. 1.1235-2(c). *Undivided interest.* A person owns an "undivided interest" in all substantial rights to a patent when he owns the same fractional share of each and every substantial right to the patent. It does not include, for example, a right to the income from a patent, or a license limited geographically, or a license which covers some, but not all, of the valuable claims or uses covered by the patent. A transfer limited in duration by the terms of the instrument to a period less than the remaining life of the patent is not a transfer of an undivided interest in all substantial rights to a patent.

[7] Sec. 1.1235-2(b). *All substantial rights to a patent.* (1) The term "all substantial rights to a patent" means all rights (whether or not then held by the grantor) which are of value at the time the rights to the patent (or an undivided interest therein) are transferred. The term "all substantial rights to a patent" does not include a grant of rights to a patent—

(i) Which is limited geographically within the country of issuance;

(ii) Which is limited in duration by the terms of the agreement to a period less than the remaining life of the patent;

(iii) Which grants rights to the grantee, in fields of use within trades or industries, which are less than all the rights covered by the patent, which exist and have value at the time of the grant; or

(iv) Which grants to the grantee less than all the claims or inventions covered by the patent which exist and have value at the time of the grant.

The circumstances of the whole transaction, rather than the particular terminology used in the instrument of transfer, shall be considered in determining whether or not all substantial rights to a patent are transferred in a transaction.

* * *

(4) The retention of a right to terminate the transfer at will is the retention of a substantial right for the purposes of section 1235.

transferor, may or may not be considered "substantial," depending on the circumstances of the whole transaction. Sec. 1.1235-2(b)(3),[8] Income Tax Regs.

Our holding in the instant case is based on our finding that, with respect to each of the eight transfers at issue, petitioner transferred an undivided interest in the right to make, use, and sell the patent rights to the Catacarb Process.[9] Further, petitioner did not limit or restrict the rights transferred in any significant manner nor did he retain any rights which we have found to be "substantial." In short, petitioner made transfers within the ambit of section 1235 and should be entitled to the benefits provided therein.[10]

At the outset, we note that respondent does not rely on any of the incomplete transfers or retained rights set forth in his regulations in attempting to invalidate the eight transfers under section 1235. His only argument along these lines involves those contracts in which petitioner affirmatively granted the transferee the right to sublicense.

As we understand this argument, respondent contends that those particular agreements also provide that petitioner will receive the transferees' royalty income from such sublicensees at the same royalty rate as the transferees pay to petitioner. Thus, in order for the transferees to make a profit on a sublicense, they would have to charge an amount in excess of the amount they were paying to petitioner. Since, respondent argues, petitioner would grant rights to the prospective sublicensee at the lower rate, it follows that, realistically, these arguments negate the transferees' right to sublicense.

---

[8] Sec. 1.1235-2(b)(3). Examples of rights which may or may not be substantial, depending upon the circumstances of the whole transaction in which rights to a patent are transferred, are:

(i) Retention by the transferor of an absolute right to prohibit sublicensing or subassignment by the transferee;

(ii) The failure to convey to the transferee the right to use or to sell the patent property.

[9] Since the early case of *Waterman v. Mackenzie,* 138 U.S. 252 (1891), the transfer of the right to "make, use, and vend" the patented product has constituted an assignment or sale of all substantial patent rights and a transfer of any less is a mere license. Although only one of the eight contracts specifically transferred the right to "make, use, and sell" the Catacarb Process, the broad language in the other seven contracts convinces us that a transfer of the same rights was intended in those contracts. Sec. 1.1235-2(b), Income Tax Regs.; accord, *Rose Marie Reid,* 26 T.C. 622, 633 (1956).

[10] Respondent does not contest the fact that, with respect to each transfer, petitioner was a "holder" as defined in sec. 1235(b) and does not allege that any of the transfers were to "related persons" within the meaning of sec. 1235(d).

We find this argument somewhat strained. First, we found only one of the six contracts that permit sublicensing that could be so interpreted.[11] Second, as respondent points out in his regulations, it is retention of the absolute right to prohibit sublicensing which may or may not be substantial depending on the circumstances. Sec. 1.1235-2(b)(3)(i), Income Tax Regs. Even if we found this contractual provision to be a retention of the absolute right to prohibit sublicensing (which we do not), we do not think, under the facts of this case, that such a retained right would be substantial. See *Vincent B. Rodgers,* 51 T.C. 927, 931 (1969).

Respondent next contends that, notwithstanding petitioner's attempt to sell and assign undivided interests in the Catacarb Process to others, certain aspects of the contractual relationships between petitioner and the respective transferees are inconsistent with coownership of the patent rights.

Respondent argues that one such aspect is that the transferees cannot exercise their rights to make, use, and sell the patent rights, and exclude others from doing so, in conjunction with petitioner. Also, he alleges an additional inconsistency to be that none of the transferees can share in the proceeds from sublicenses granted by petitioner or the other coowners.

On these two points, respondent is mistaken. Coownership in patent rights is created when the owner assigns an undivided interest in such rights to another. Ellis, Patent Assignments, sec. 391 (3d ed. 1955). With respect to the rights and responsibilities between one joint or coowner and another, Patent Act, 35 U.S.C. sec. 262 (1970), provides as follows:

Sec. 262. Joint Owners.

In the absence of any agreement to the contrary, each of the joint owners of a patent may make, use or sell the patented invention without the consent of and without accounting to the other owners.

Further, there is overwhelming authority in the patent law area that each coowner has the right to sublicense and, absent an agreement to the contrary, need not account to his coowners for the royalties received therefrom. Ellis, *supra* at sec. 397, and cases cited therein.

Respondent further argues that the fact that none of the transferees recorded their ownership interests with the Patent Office in order to protect such interests against subsequent

---

[11] The contract with the Bechtel Corp. provided that Bechtel could sublicense if it paid to petitioner "all royalties herein provided."

purchasers is inconsistent with actual ownership of the interests transferred.[12] We do not think that such failure is, in itself, sufficent to negate the numerous aspects of these transactions which indicate that petitioner disposed of undivided interests in all substantial rights to the Catacarb Process sufficient to create coownership status with each transferee. Further, we note that the validity, as between the parties, of an assignment of patent rights creating coownership of such rights, is not affected by failure to record the assignment. *Hook v. Hook & Ackerman,* 187 F. 2d 52, 58 (3d Cir. 1951); *United States v. Krasnov,* 143 F. Supp. 184, 201 (E.D. Pa. 1956), affd. per curiam 355 U.S. 5 (1957).

We think respondent's primary reason for attacking the transfers in the instant case lies not in the substantiality of the rights petitioner retained but rather in the size and extent of the interests he sold.

With respect to the three pre-1968 contracts, respondent argues that, under the authority of *Walen v. United States,* 273 F. 2d 599 (1st Cir. 1959), petitioner must sell a measurable, defined share of his interest in order to avail himself of the benefits of section 1235. With respect to the five post-1968 contracts in which petitioner sold an "undivided 1% interest," respondent argues that there is essentially no difference between these contracts and the pre-1968 contracts and that to elevate these five contracts to the sale of actual ownership interests is to elevate form over substance. We disagree.

Section 1235 clearly provides that the transfer of an undivided interest in all substantial patent rights qualifies for capital gains treatment. We have been unable to discover any authority in the Code, regulations, or committee reports for the proposition that the undivided interest so transferred must be of a specific and definite amount.

In most circumstances it is highly improbable that two parties, operating at arm's-length, would enter into a sale of part ownership in property without quantifying the part being sold. We think that, if such a transaction occurred, a strong argument

---

[12] 35 U.S.C. sec. 261 (1954) provides, in part, as follows:

An assignment, grant or conveyance shall be void as against any subsequent purchaser or mortgagee for a valuable consideration, without notice, unless it is recorded in the Patent Office within three months from its date or prior to the date of such subsequent purchase or mortgage. * * *

could be made that the parties did not intend to create coownership status.

The sale of patent rights, however, is not such a case. As one leading authority has stated:

Except in the case of infringement suits or where there is an agreement between the coowners for accounting in proportion to their respective interests, the amount of the undivided interest assigned is of no importance. An assignment of one-thousandth part gives just as much right of action as an assignment of one-half or other part. [Ellis, *supra* at sec. 394.]

We realize that there is dictum in *Walen v. United States, supra,* to support respondent's position with respect to the pre-1968 contracts. In that case the court held that the taxpayer did not transfer all substantial rights to his patent when he transferred a nonexclusive license to "use and practice said invention." [13] In a footnote discussing the case of *Kavanagh v. Evans,* 188 F. 2d 234 (6th Cir. 1951), the court said (273 F. 2d at 602):

We do not question that a taxpayer might sell a partial interest in an invention. However, to do so it should be a transfer of a measurable, identifiable share, and not of an undefined one of elastic proportions dependent upon how many subsequent "shares" the grantor might elect to create. Whether we would agree with the actual decision in Kavanagh as a proper application of this principle is another matter. It is clear that this principle is not applicable to the facts in the case at bar.

The court in *Walen* was apparently concerned with the seeming inequity in allowing the seller of patent rights to sell an unlimited number of interests in such rights and receive capital gains treatment with respect to all such sales. We appreciate this concern, but we see no legal or equitable reason to create a formalistic distinction between the selling of an undefined undivided interest and the selling of an undivided one- (or one-thousandth of one) percent interest. In either case, assuming willing purchasers can be found, the seller will legally and realistically be able to sell as many interests in his patent rights as the market will bear. [14]

---

[13] Because this case involved taxable years beginning prior to 1954, sec. 1235 was not at issue. However, the committee reports relating to the enactment of sec. 1235 provide that the realistic test under prior law as to whether all substantial rights to a patent have been transferred should be continued under that section. S. Rept. No. 1622, 83d Cong., 2d Sess. 440 (1954). To this extent, the case is relevant to the issue at hand.

[14] Of course, subsequent assignees who sell undivided interests in the interest received from petitioner will not be accorded capital gains treatment under sec. 1235 on the amounts received therefor because such assignees would not be "holders." Sec. 1235(b)..

Thus, we do not think that the size or extent of the undivided interest is relevant in determining whether a transfer of patent rights qualifies for capital gains treatment under section 1235. Instead, we think the proper focus should be on the substantiality of the rights transferred and retained. As we have previously pointed out, in each of the eight transfers at issue, petitioner clearly transferred all and retained none of the substantial rights to the Catacarb Process. Because computations are necessary with respect to other issues,

*Decision will be entered under Rule 155.*

_____
Sec. 1235 was explicitly not designed for the benefit of subassignees. H. Rept. No. 1337, 83d Cong., 2d Sess. A280 (1954).
[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.