E. I. du PONT de NEMOURS AND COMPANY

v.

UNITED STATES of America, Appellant.

No. 17948.

United States Court of Appeals, Third Circuit.

Argued Feb. 16, 1970.

Decided Oct. 13, 1970.

William Friedlander, U. S. Dept. of Justice, Tax Division, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Meyer Rothwacks, Jeanine Jacobs, Attys., Dept. of Justice, Washington, D. C., F. L. Peter Stone, U. S. Atty., on the brief), for appellant.

Karl R. Price, Ivins, Phillips & Barker, Washington, D. C. (Roy A. Wentz, Jr., John F. Palmer, Wilmington, Del., on the brief), for appellee.

Before KALODNER and VAN DUSEN,\* Circuit Judges, and FULLAM, District Judge.

---

\* Judge Van Dusen did not participate in the ultimate determination of this case.

1. Nylon is made from polyamide, dacron from polyester. For convenience, the fa-

OPINION OF THE COURT

FULLAM, District Judge:

This appeal raises two unrelated tax issues: (1) whether funds received by the taxpayer in exchange for the assignment of certain Brazilian patents were taxable as ordinary income or as capital gain; and (2) whether certain legal expenses incurred in connection with the reorganization of a Canadian subsidiary of the taxpayer were deductible as ordinary business expenses, or were capital expenditures. The District Court, 296 F.Supp. 823, decided both questions in favor of the taxpayer, and the government appeals.

## I

### *The Brazilian Patents Issue*

The taxpayer was the owner of eight Brazilian patents relating to the manufacture of nylon fibers. All were process patents, but four also covered apparatus used in the manufacture of the fibers and four included claims having applicability to dacron as well.[1]

In January 1954, the taxpayer entered into two related agreements with a French chemical corporation, Societa Rhodiaceta (hereinafter Rhodiaceta) and its Brazilian affiliate, Companhia Brasileira Rhodiaceta (hereinafter CBR), the effect of which was to transfer rights in all of these eight Brazilian patents to CBR, for a consideration of $5,500,000, so that CBR could engage in the manufacture of nylon in Brazil. Of the agreed payment, $4,094,000 was paid during 1954, and in its tax return for that year, the taxpayer included this amount as ordinary income. Thereafter, a timely claim for refund was filed, on the theory that this payment should have been treated as a capital gain. When the refund was refused, the taxpayer brought suit in the court below and recovered judgment in its favor.

miliar designation given these products by the taxpayer will be used in this opinion, rather than the technical terms, although the latter would be arguably more accurate.

The record discloses the following background to this transaction: In 1946, the taxpayer had assigned to Rhodiaceta its nylon patents in France, Belgium, Spain and Switzerland, and had made available to Rhodiaceta its current nylon technology; and in exchange Rhodiaceta had agreed to pay the taxpayer a continuing royalty. In 1948, Rhodiaceta had licensed the taxpayer under its cellulose acetate yarn patents in the United States and Canada, in exchange for which the taxpayer had agreed to pay Rhodiaceta a continuing royalty. In 1950, Rhodiaceta sought to obtain from the taxpayer nylon rights for CBR under the taxpayer's Brazilian nylon patents. On March 20, 1952, after extended negotiations, these rights were granted to CBR by a non-exclusive license, under which CBR immediately paid a security deposit of $250,000 and agreed to pay a continuing royalty through 1974. On the same date, the taxpayer executed a separate agreement with Rhodiaceta under which the taxpayer agreed, *inter alia,* to make available to Rhodiaceta the taxpayer's entire nylon technology up to September 30, 1952, and authorized its use by Rhodiaceta and its licensees, including CBR; and Rhodiaceta agreed to cancel the taxpayer's continuing royalty obligation under the 1948 cellulose acetate yarn agreement.

Insofar as Rhodiaceta was concerned, the agreement was carried out, but the provisions of the 1952 license agreement with CBR could not be carried because the Brazilian government refused to approve the agreement and to make available the necessary foreign exchange. It further appeared that the Brazilian government opposed in principle any non-exclusive licensing arrangement, particularly one which would be likely to pro-

duce a recurring drain on its dollar reserves.

Thereafter, negotiations continued with a view toward obviating these difficulties. It was the position of Rhodiaceta and CBR that they were interested only in exclusive nylon rights in Brazil, and that, for foreign exchange reasons, it would be helpful to channel the transfer through Rhodiaceta. The taxpayer was willing to grant exclusive nylon rights, on a fixed-price basis, payable over a very short period. Moreover, the taxpayer felt constrained by the terms of a recent antitrust decree to reserve the right to import into Brazil nylon lawfully manufactured in the United States.

The ultimate outcome of these negotiations was the transaction now under scrutiny. The taxpayer entered into the two agreements referred to above, one with Rhodiaceta dated January 4, 1954, and the other with CBR dated January 19, 1954, the net effect of which was to transfer to Rhodiaceta and CBR the exclusive right to make, use and sell nylon in Brazil, and to license others to do so, for the full life of the patents, subject to the taxpayer's reserved right to import, for a total consideration of $5,500,000, part of which was to be paid by CBR and part by Rhodiaceta.

It is undisputed that the taxpayer had held the patent rights in question for more than six months prior to the transfer, and had not held them for sale to customers. Accordingly, the only question is whether the transfer constituted a sale of such rights within the meaning of sections 1222 and 1231 of the Code. Neither the Code itself, nor treasury regulations define what constitutes a sale for capital gains purposes.[2]

2. Section 1235 of the Code provides for capital gain treatment of certain patent transfers, whether or not they would otherwise qualify under the general capital gain provisions of sections 1201–1231. However, this section does not apply to transfers by corporations. Section 1235 does not, of course, deny capital gain treatment to patent transfers by corporations, if such transfers qualify as sales under the general capital gain provisions. Treasury Regulations 1.1235–1 (b) Robert L. Holcomb, 30 T.C. 354, ACQ. 1958–2 CB 6; Revenue Ruling 69–482, IRB 1969–36, page 16.

■ Patent rights are intangible property rights, the transfer of which may qualify as a sale for capital gain purposes. The precise form and terminology of the transfer are not controlling, so long as it transfers exclusive rights for the full life of the patent. Lockhart v. Commissioner of Internal Revenue, 258 F.2d 343 (3rd Cir. 1958); Merck & Co., Inc. v. Smith, 261 F.2d 162 (3rd Cir. 1958); General Aniline & Film Corp. v. Commissioner of Internal Revenue, 139 F.2d 759 (2d Cir. 1944). As stated by this Court in Merck & Co., Inc. v. Smith, *supra*, at page 164 of 261 F.2d:

> "* * * a transfer of all of the substantial rights in a patent is deemed an assignment and qualifies the transferor for capital gains treatment. A transfer of anything less is called a license with a resultant assessment of the tax at ordinary income rates."

To determine whether the taxpayer did transfer all of the substantial rights in the patents in question, the key question is whether the transferor retained any rights which, in the aggregate, have substantial value. See Allied Chemical Corp. v. United States, 370 F.2d 697 (2d Cir. 1967); Merck & Co., Inc. v. Smith, *supra*; Schmitt v. Commissioner of Internal Revenue, 271 F.2d 301 (9th Cir. 1959).

In the present case, the government contends that the taxpayer retained the following valuable rights in connection with the transfer:

1. The right to import into Brazil nylon lawfully manufactured elsewhere;

2. The right to control any subsequent licensing or assignment of the rights granted Rhodiaceta and CBR with respect to the use of the patented process and apparatus in making nylon;

3. The right to make any use it saw fit (including manufacturing under its own auspices, licensing, sale, etc.) of the patent rights in connection with dacron; and

4. The right to manufacture for sale the apparatus covered by the patent or to license others to manufacture the apparatus for use, in connection with the manufacture of fibers other than nylon (especially dacron).

The District Court carefully analyzed all of the rights retained by the taxpayer, and specifically found that they were of no substantial value. On appeal, the government contends that each of these findings was erroneous, and that, in any event, the District Court erred in treating each right individually and in failing to make a finding that, in the aggregate, the retained rights had substantial value.

■ In our view, this latter argument represents a too narrow reading of the District Court opinion. After analyzing each of the rights individually, and finding it valueless, the District Court concluded that the taxpayer had not retained substantial rights in the patents, and that the transfer qualified for capital gains treatment. Indeed, at the conclusion of his discussion of the various retained rights, Chief Judge Wright expressly stated:

> "No substantial rights in the eight patents transferred having been retained, the 1954 transactions constituted a sale of those patents, the proceeds of which are entitled to capital gains treatment." (296 F.Supp. 833).

Accordingly, the only issue before this Court is whether the District Court findings are clearly erroneous. We have concluded that the record adequately supports the findings of the District Court.

1. *Right to import.* There was ample evidence in the record to justify the conclusion that the reservation by the taxpayer of the right to import nylon into Brazil, and to license others to do so, preserved nothing of value to the taxpayer. The parties contemplated that the government of Brazil would adhere to its policy of excluding such im-

ports, once a Brazilian company entered the market. Subsequent events have borne out the accuracy of this assumption.

In this connection, we note, but need not pass upon, taxpayer's further argument that this reservation was included in the agreement because it was believed to be required by the provisions of an antitrust decree; hence, the argument goes, the taxpayer lacked the legal capacity to transfer a right to preclude imports, so that this right should be deemed non-existent rather than retained.

Moreover, it is by no means clear that the (theoretical) right to import into Brazil nylon lawfully manufactured in the United States (presumably, under taxpayer's American patents) derogates from the completeness of the transfer of the Brazilian patents. Rather, such rights would seem to be more directly related to the independent American patent rights.

2. *Right to sell and sublicense equipment.* As noted above, four of the eight patents transferred covered apparatus as well as process. The two 1954 agreements (Article V of the Rhodiaceta agreement and Article III of the CBR agreement) can be read to mean that, while both grantees received the right to make and use, in their own plants, the apparatus and equipment covered by the patents, neither grantee had the right to sell such equipment. The agreements can also be read to mean that while CBR had the right to sublicense others to make, use and sell nylon, it did not have the right to sublicense others to make and use the required equipment. The District Court found that the only limitation, insofar as Rhodiaceta is concerned, was the inability to sell equipment; and that, "* * * the manufacture of equipment for sale to other fiber producers is a function separate and distinct from manufacture of equipment for use in one's own fiber production. Accordingly, the apparatus patents in is-

sue here are divisible along that line." (832).

Insofar as CBR is concerned, the District Court found that, under the foregoing interpretation of the agreements, the taxpayer in effect reserved to itself a veto power over CBR's ability to sublicense production use and sale of nylon. The District Court concluded that this veto power was of no substantial value.

The taxpayer suggested at oral argument in the court below, and reiterates on appeal, that the 1954 agreements are ambiguous on these matters, and that the parties did not intend to impose the above restrictions. No evidence was presented on this point, and the District Court found it unnecessary to choose the correct interpretation of the agreements. We likewise find it unnecessary to consider the taxpayer's alternative argument.

In our view, the District Court was correct in concluding that, assuming the taxpayer retained a veto power over sublicensing, that fact would not mean that the taxpayer failed to transfer substantially all rights in the patents. In Rollman v. Commissioner of Internal Revenue, 244 F.2d 634 (4th Cir. 1957), the transfer documents expressly provided that the grantee could not grant sublicenses under the patents except with the written consent of the transferor. The court held:

"Such a limitation does not interfere with the full use of the patent by the assignee * * * Moreover, the assignor retains no use of the patent for himself by reason of the limitation since he has granted the exclusive rights to the assignee and cannot grant a sublicense without the purchaser's consent." (At page 640)

The Court of Claims has adopted the same reasoning. Bell Intercontinental Corp. v. United States, 381 F.2d 1004, 1017, 180 Ct.Cl. 1071 (1967).

3. *The dacron rights.* Four of the eight patents in question are at least theoretically applicable to dacron as well as nylon, but only the nylon rights were

transferred. The District Court found that the retained dacron rights were not of substantial value, and that, in any event, they were severable. The government here challenges both of these findings.

It is apparent that the District Court was persuaded by the testimony presented on behalf of the taxpayer, to the effect that the patents were of extremely minor importance in the manufacture of dacron; that dacron could be manufactured without resort to the processes and equipment covered by these patents; and that use of these patents for dacron in Brazil was foreclosed by the basic Whitfield and Dixon patent, owned by Imperial Chemical Industries, Ltd. In view of this evidence, we certainly cannot say that the District Court's finding of no substantial value was clearly erroneous.

█ Moreover, we agree with the District Court's conclusion that, for capital gains purposes, the nylon rights, considered independently, were proper subjects for a sale. For such purposes, patent rights are divisible between different industries and different industrial products. Merck & Co., Inc. v. Smith, *supra*; United States v. Carruthers, 219 F.2d 21 (9th Cir. 1955); First National Bank of Princeton v. United States, 136 F.Supp. 818 (D.N.J.1955); Estate of M. J. Laurent, Sr., 34 T.C. 385 (1960) and William S. Rouverol, 42 T.C. 186 (1964). *See also* Thomas L. Fawick, 52 T.C. 104 (1969). These cases are not in conflict with Pope Manufacturing Co. v. Gormully & Jeffery Manufacturing Co. (No. 3) 144 U.S. 248, 12 S.Ct. 641, 36 L.Ed. 423 (1892); E. W. Bliss Co. v. United States, 253 U.S. 187, 40 S.Ct. 455, 64 L. Ed. 852 (1920); Waterman v. Mackenzie, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1891), or the other cases relied upon by the government, all of which dealt with the presently non-controlling procedural issue of whether the transferee could bring suit in its own name.

For the foregoing reasons, we have concluded that the District Court was correct in deciding that the reservation of dacron rights (including equipment rights, government's contention No. 4 above) did not amount to a reservation of anything having substantial value, derogating from the completeness of the transfer of the nylon rights.

4. *Know-how · allocation.* The government's final contention on the patent issue is that some portion of the $5,-500,000 purchase price should have been allocated as consideration for the transfer of technical information, which the taxpayer was required to furnish pursuant to the agreements, and which was in fact furnished by permitting representatives of the purchasers to visit the taxpayer's Martinsville, Virginia, plant in 1954. The government argues that the value of this technical information is established in the record at $250,000; alternatively, the government argues that the case should be remanded to the District Court for specific findings as to the proper allocation.

█ The District Court found that the Martinsville visit was insignificant, and that substantially all of the technical information had already been furnished pursuant to previous arrangements in 1952. There is support in the record for such findings. Moreover, we are satisfied that whatever transfer of technical information occurred in 1954 was incidental to the sale of the patent rights. The suggestion that Rhodiaceta may have obtained some information which would be helpful in its European operations, independently of the Brazilian patents, we regard as too ephemeral for present significance. The government's contention really amounts to an assertion that the taxpayer should have charged Rhodiaceta an additional sum for this information, rather than a contention that the taxpayer actually did receive such income.

The government has apparently abandoned the argument, made in the court below, that a $250,000 "security deposit" received by the taxpayer in connection with the aborted 1952 agreement, and

credited in 1954 on account of the 1954 agreements, constituted ordinary income in 1954. In any event, we see no occasion to disturb the lower court's disposition of this contention.

For the foregoing reasons, the Judgment of the District Court, insofar as it concerns the Brazilian patents issue, will be affirmed.

## II

### Legal Expenses

Prior to 1952, the taxpayer and Imperial Chemical Industries, Ltd. (ICI) each owned 42% of Canadian Industries, Ltd. (CIL), a Canadian corporation; the remaining 16% was owned by public shareholders. On July 30, 1952, the United States District Court for the Southern District of New York entered a final judgment in an antitrust proceeding brought by the government against the taxpayer and ICI, under the terms of which the taxpayer and ICI were required to terminate their joint interests in CIL. Under the terms of the judgment, termination of the joint interests could be accomplished in any one of four ways, one alternative being the physical segregation of the CIL assets between the taxpayer and ICI. This alternative was adopted, and a plan, approved by the New York District Court in January, 1954, was consummated on July 1, 1954.

Briefly, the original Canadian enterprise, CIL, was renamed du Pont of Canada Securities, Ltd. (DCSL), the capital structure of which was rearranged to increase public ownership by 10% and to increase preferred dividends. All of the assets of CIL were divided equally, ICI's half going to a new corporation, Canadian Industries (1954) Ltd. (CIL 54), and the taxpayer's half going to another new corporation, du Pont Company of Canada, Ltd., a wholly-owned subsidiary of the restructured DCSL.

In developing and carrying out the segregation plan, the taxpayer incurred legal expenses during 1954 in the sum of $121,329, which it sought to deduct, in its tax return for that year, as ordinary and necessary business expense pursuant to section 162(a) of the Internal Revenue Code of 1954. The deduction was disallowed, but the taxpayer prevailed in the lower court in its suit for a refund.

If these legal expenses were incurred in an attempt to defend and preserve the taxpayer's Canadian business enterprise from the assault represented by the government antitrust litigation in New York, they were properly deductible as ordinary and necessary business expense. Commissioner of Internal Revenue v. Heininger, 320 U.S. 467, 64 S.Ct. 249, 88 L.Ed. 171 (1943) (defense of a mail order concern against enforcement of a post office fraud order); Commissioner of Internal Revenue v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966) (defense of a securities dealer against criminal prosecution for violation of securities act). If, on the other hand, the expenditures fall within the general category of reorganization expenses, they should be capitalized and are not deductible. Missouri-Kansas Pipe Line Co. v. Commissioner of Internal Revenue, 148 F.2d 460, 462 (3d Cir. 1945); Gravois Planing Mill Co. v. Commissioner of Internal Revenue, 299 F.2d 199, 206 (8th Cir. 1962); Skenandoa Rayon Corp. v. Commissioner of Internal Revenue, 122 F.2d 268, 271 (2d Cir. 1941) cert. den. 314 U.S. 696, 62 S.Ct. 413, 86 L.Ed. 556. See also General Bancshares Corp. v. Commissioner of Internal Revenue, 326 F.2d 712, 715 (8th Cir. 1964), where it was held that the expense of issuing non-taxable stock dividends was not deductible as ordinary and necessary business expense, but was an expenditure related to capital. These general principles have recently been reiterated and applied in Woodward v. Commissioner of Internal Revenue, 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (April 20, 1970) and United States v. Hilton Hotels Corporation, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (April 20, 1970).

■ The fact that the expenditures were involuntary, in that they were necessary to comply with the law, does not negative a requirement that they be capitalized, if they were in fact capital expenditures. Woolrich Woolen Mills v. United States, 289 F.2d 444 (3rd Cir. 1961).

■ Section 162(a) permits deduction of "ordinary and necessary expenses paid or incurred ⁚ * * * in carrying on any trade or business. * * * *" Section 263(a) requires capitalization, rather than deduction, of "amounts paid out for * * * permanent improvements or betterments made to increase the value of any property." The District Court concluded that since the restructuring of the Canadian enterprise did not result in enhancement of its value, "the only reasonable conclusion must be that du Pont's efforts and expenditures in 1954 were aimed at conservation and protection of its existing Canadian investment with the least possible harm in light of the anti-trust mandate which du Pont faced" (296 F.Supp. 837); and permitted the deduction. In adopting this approach, the court inadvertently seems to have misplaced the burden of proof. It was not incumbent upon the government to establish that the expenditures in question resulted in an acquisition of additional property or enhancement of the value of existing assets; rather, the burden was on the taxpayer to show that these were "ordinary and necessary expenses" incurred "in carrying on [its] trade or business."

We are not here concerned with the legal expenses incurred in defending against the antitrust litigation itself. That litigation terminated in a judgment which required a severance of the joint interests of the taxpayer and ICI in the Canadian enterprise. Several options were available to the taxpayer, most of which would have involved a termination of its Canadian business activities. The taxpayer chose instead to set up a new Canadian corporation to retain half of the assets and continue in

business. The expense of this reorganization should clearly not be charged against the income of any one year. Rather, the expenditures resulted in a benefit to the taxpayer which could be expected to produce returns for many years in the future. Compare Clark Thread Co. v. Commissioner of Internal Revenue, 100 F.2d 257 (3rd Cir. 1938). As stated in 4A Merten's Law of Federal Income Taxation (1966) (Revision), section 25.20, page 100:

"Assuming that the expenditure is ordinary and necessary in the operation of the taxpayer's business, the answer to the question as to whether the expenditure is an allowable deduction as a business expense must be determined from the nature of the expenditure itself, which in turn depends on the extent and permanency of the work accomplished by the expenditure."

See also McDonald v. Commissioner of Internal Revenue, 139 F.2d 400 (3rd Cir. 1943) aff'd 323 U.S. 57, 65 S.Ct. 96, 89 L.Ed. 68 (1944); Falstaff Beer, Inc. v. Commissioner of Internal Revenue, 322 F.2d 744 (5th Cir. 1963).

■ It may be that, in an appropriate case, legal expense incurred in obtaining advice as to how best to comply with a divestiture decree might properly be regarded as attributable to the defense of the antitrust litigation, and thus deductible; whereas legal expenses incurred in carrying out the plan of action decided upon, if it involved restructuring of the enterprise, should be attributed to capital expenditure. In the present case, however, the taxpayer made no attempt at such a breakdown. With respect to the entire expenditure, therefore, we hold that the taxpayer failed to meet its burden of proving deductibility under section 162(a).

For the reasons stated the judgment of the District Court insofar as it concerns the Legal Expenses issue will be reversed.

The Judgment of the District Court entered February 24, 1969 will be vacat-

ed and the cause remanded with directions to the District Court to enter a Judgment in accordance with this opinion.