T.C. Memo. 2016-45

UNITED STATES TAX COURT

MYLAN INC. AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16145-14, 27086-14.          Filed March 10, 2016.

<u>Armando Gomez</u>, <u>Christopher P. Murphy</u>, <u>Christopher G. Sigmund</u>, <u>Roland Barral</u>, and <u>Alan J.J. Swirski</u>, for petitioners.

<u>Emily J. Giometti</u>, <u>Donna P. Leone</u>, and <u>Lisa M. Rodriguez</u>, for respondent.

MEMORANDUM OPINION

LARO, <u>Judge</u>:  These cases are before the Court consolidated for purposes of trial, briefing, and opinion.  Petitioners petitioned the Court to redetermine the following Federal income tax deficiencies determined by respondent:

[*2]

| Year | Deficiency |
|------|-----------|
| 2007 | $1,223 |
| 2008 | 98,622,234 |
| 2009 | 4,382,422 |
| 2011 | 1,215,101 |

The deficiencies arise from the alleged sale by Mylan, Inc. (Mylan), of intellectual property rights in a chemical compound called nebivolol to a third party, Forest Laboratories Holdings, Ltd. (Forest), in 2008.  Respondent argues that the proceeds from the alleged sale should be characterized as ordinary income while petitioners assert that the transaction resulted in capital gain.

Pending before the Court is respondent's motion for summary judgment under Rule 121[1] filed on September 16, 2015.  Respondent argues that according to the plain language of the contracts effecting the alleged sale, Mylan merely granted a sublicense to Forest.  Petitioners argue that because Mylan disposed of substantially all the rights it had in nebivolol, the wording of the contract does not preclude characterization of the transaction as a sale of a capital asset for tax purposes.  For the reasons set forth below, we will deny respondent's motion.

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) applicable to the relevant years.  Rule references are to the Tax Court Rules of Practice and Procedure.  We round dollar amounts to the nearest dollar.

**[*3]**                                 Background

I.     Preliminaries

We have derived the recitations listed in this background section primarily from the undisputed portions of each party's statement of the facts, as drawn from the pleadings and other acceptable materials.  We set forth all recitations solely for purposes of deciding respondent's motion and not as a finding of any fact.  See Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994).  Absent stipulation to the contrary, an appeal of these cases will lie to the Court of Appeals for the Third Circuit.

II.    Nebivolol Agreements

A.     2001 Agreement

Mylan is a publicly traded corporation organized under the laws of the State of Pennsylvania.  Mylan, Inc., changed its name from Mylan Laboratories, Inc., to Mylan, Inc., in October 2007.  Mylan is a generic and specialty pharmaceutical company headquartered in Canonsburg, Pennsylvania.

Before 2001 Janssen Pharmaceutica N.V. (Janssen), a corporation organized under the laws of Belgium, patented a compound called nebivolol.  Nebivolol is a beta-blocker, a type of medicine used to treat hypertension and heart conditions and as a part of migraine therapy.

**[*4]**  On February 21, 2001, Janssen and Mylan entered into the License Agreement Concerning Nebivolol (2001 agreement) for exclusive rights to import, use, and sell nebivolol, and to make, use, and sell products containing it within the United States and Canada.  According to the terms of the 2001 agreement, Mylan held an exclusive license for the compound in the United States and Canada. Janssen would manufacture nebivolol and sell it to Mylan in the quantities it requested for a price determined by a formula set in the 2001 agreement.  Mylan was responsible for processing and packaging licensed nebivolol products, as well as promoting, selling, and diligently marketing such products to obtain maximum sales and meet sales performance targets.  Mylan was also responsible for compliance with U.S. Food and Drug Administration (FDA) regulations and obtaining its approvals for the nebivolol products.  Specifically, Mylan contemplated seeking approval for the use of nebivolol in treatment of hypertension and congestive heart failure.

The 2001 agreement required Mylan to make certain milestone payments, including an upfront $2.5 million licensing fee, totaling up to $12 million.  Mylan had sole discretion to set prices for its nebivolol-containing products, and labeling and promotional materials would bear Mylan's name as a licensee, distributor, and/or manufacturer of the licensed products.

**[*5]** As a part of its license, Mylan could grant sublicenses with prior written approval of Janssen. Article 2.1 of the 2001 agreement stated that Mylan would at all times remain directly responsible to Janssen for all its obligations under the 2001 agreement should Mylan grant any sublicenses. Article 24.2 of the 2001 agreement also contemplated assignments, but expressly conditioned assignment or other forms of disposition of the rights on prior written consent of the nondisposing party. The term of the 2001 agreement was based on the duration of the last to expire of the patents licensed under the agreement. After receiving the license under the 2001 agreement, Mylan amortized it as an intangible asset using a straight-line method.

B.     2006 Agreement

In 2005, after Mylan received FDA approval for the use of nebivolol for hypertension treatment, the company sought potential partners for commercialization of the compound. As a result, on January 6, 2006, Mylan and Forest entered into the Nebivolol Development and Commercialization Agreement (2006 agreement). Under the terms of the 2006 agreement, Mylan granted to Forest an exclusive sublicense under the 2001 agreement, as well as an exclusive license to some of its own know-how related to nebivolol products.

**[*6]** Mylan continued to be involved in the commercialization of nebivolol through participation in the Joint Development Committee established pursuant to the 2006 agreement. Mylan also negotiated for the option to copromote Bystolic (one of the nebivolol-containing medicines licensed under the 2001 agreement) alongside Forest and the first option to launch an authorized generic. Forest and Mylan worked out a noncompete agreement preventing both companies from promoting other beta-blockers in the United States and Canada. Mylan remained responsible for purchasing nebivolol from Jansen and importing it as well as manufacturing nebivolol-containing products until Forest's manufacturing plant was ready for use.

Mylan and Forest agreed that unless earlier terminated, the 2006 agreement would continue in full force and effect until the parties cease to sell, develop, and commercialize nebivolol-containing products in the United States and Canada. In addition, the parties could terminate the 2006 agreement in case of a material breach or bankruptcy of one of the parties. Forest reserved the right to terminate the 2006 agreement upon delivery of notice to Mylan that it reasonably believed that there were safety or efficacy issues with the product that were likely to prevent or delay regulatory approval of the product in the United States or negatively affect commercialization of nebivolol. In that case, the rights to

[*7] nebivolol and any know-how developed by Forest under the 2006 agreement would revert to Mylan. If the 2006 agreement were to terminate because of a breach or bankruptcy, the nonbreaching party would have a perpetual, fully paid license to all intellectual property covered by the 2006 agreement.

To enter into the 2006 agreement, Mylan had to receive written approval from Janssen under the terms of the 2001 agreement. Janssen granted approval for a sublicense to Forest on the terms outlined in the 2006 agreement (Janssen approval), but explicitly conditioned the approval on Mylan's remaining fully liable for the acts and omissions of Forest and Forest's purchasing all of its requirements for nebivolol from Mylan, which would in turn purchase them from Janssen. Article 3 of the Janssen approval was entitled "Consent to Sublicense" and read, in part: "(a) Janssen consents to a sublicense by Mylan to Forest of the rights and licenses granted in Section 2.1 of the [2001 agreement]."

In 2006 Mylan received a $75 million upfront payment as a part of the consideration due under the 2006 agreement. In addition, Mylan was to receive other milestone payments totaling $155 million. Forest would pay royalties to Mylan calculated as a percentage of net sales, up to 45% if the aggregate net sales exceed $1 billion. Mylan remained responsible for all payments due to Janssen under the 2001 agreement.

**[*8]** A clause in the 2006 agreement stated that the contract "shall be governed and construed in accordance with the laws of the [S]tate of New York * * * as to all matters, including, but not limited to matters of validity, construction, effect, performance and remedies." The 2006 agreement contained the following additional clauses on interpretation and construction of the agreement:

> 18.14.     Interpretation.  The Parties acknowledge that this Agreement is a product of negotiations and that no inference should be drawn regarding the drafting or preparation of this Agreement.

> 18.15.     Construction.  The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction shall be applied against any party. * * *

In 2008 Mylan entered into two closing agreements with the Internal Revenue Service (IRS) under section 7121 to defer inclusion in income of the $75 million upfront payment and the $25 million hypertension treatment approval milestone payment under provisions of Rev. Proc. 2004-34, 2004-1 C.B. 991, which applies inter alia to advance payments received for the use, including by license, of intellectual property.

C.     2008 Amendment

By 2008 Mylan needed additional cash to raise funds for corporate acquisitions and maintain its credit rating.  After considering the risks related to

[*9] the future commercial success of nebivolol, Mylan approached Forest about amending the 2006 agreement.

On February 27, 2008, Mylan and Forest entered into an Amendment Agreement to Nebivolol Development and Commercialization Agreement (2008 amendment). Under the terms of the 2008 amendment, Mylan gave up its rights to participate in the future commercialization of nebivolol, including the right to participate in the Joint Development Committee, participate in copromotion of Bystolic, the option to launch a generic, and the right to inspect Forest's facilities. The 2008 amendment contained an optional right for Mylan to develop and commercialize nebivolol on a coexclusive basis for the prevention of migraines. Mylan also agreed to facilitate any negotiations between Forest and Janssen if it became necessary, as well as to continue purchasing nebivolol from Janssen and reselling it to Forest. For this role as a middleman, Mylan received 1% of the amounts payable to Janssen in consideration for the continued supply of nebivolol. Forest agreed to pay all of the amounts due to Janssen under the 2001 agreement to Mylan, and Mylan would in turn transfer the payments to Janssen.

The 2008 amendment did not alter the mutual rights of Janssen and Mylan with respect to each other under the 2001 agreement and the Janssen approval. Under the 2006 Janssen approval terms, Mylan remained responsible for all

[*10] actions of Forest under the sublicense, and Janssen's sole recourse for any violation of the 2001 agreement was against Mylan. Mylan did not seek additional approval from Janssen for the 2008 amendment.

The 2008 amendment stated that the 2006 agreement remained in full force and effect in accordance with its terms. Pursuant to their terms, the 2008 amendment should be construed together with the terms of the 2006 agreement as a single agreement, provided that any inconsistent terms would be governed by the terms of the 2008 amendment.

The 2008 amendment did not alter the termination provisions of the 2006 agreement. Mylan retained the reversionary rights in the sublicense granted to Forest in case of a material breach of contract or upon expiration of the term of the 2006 agreement.

Pursuant to the 2008 amendment, Mylan received $370 million up front and was entitled to two additional milestone payments of 5 million euro, each conditioned on FDA approval for the use of nebivolol in the treatment of congestive heart failure and the launch of commercial sales for that indication. Forest also agreed to pay to Mylan royalties based on aggregate annual sales of the nebivolol-containing products for three years after the 2008 amendment. The

**[*11]** amended royalties schedule reduced the maximum rate of royalties to 25% as compared to 45% under the 2006 agreement.

Mylan treated the proceeds received from the 2008 amendment as proceeds received from an installment sale of business property. On its Form 10-K, Annual Report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934, filed with the Securities and Exchange Commission (SEC), Mylan stated that it "sold" its rights to nebivolol. Forest issued a press release on February 27, 2008, stating that it would "assume" Mylan's commercial rights for Bystolic. Forest reported on its Form 10-K that Mylan's "commercial rights" in Bystolic were "terminated" as a result of the 2008 amendment.

D. <u>Termination of the 2001 Agreement, 2006 Agreement, and 2008 Amendment</u>

On March 30, 2012, Forest purchased from Janssen all the patents that were subject to the 2001 agreement in exchange for $357 million. On the same date Janssen, Forest, and Mylan executed a termination agreement pursuant to which the 2001 agreement, the 2006 agreement, and the 2008 amendment were terminated. Forest did not pay any additional consideration to Mylan in connection with the 2012 termination agreement.

**[\*12]**                                    Discussion

I.    Legal Standard for Summary Judgment

Either party may move for summary judgment on all or some of the legal

issues in dispute.  See Rule 121(a).  Summary judgment expedites litigation and

avoids unnecessary and expensive trials.  See Craig v. Commissioner, 119 T.C.

252, 259 (2002).  Summary judgment may be granted with respect to all or any

part of the issues "if the pleadings, answers to interrogatories, depositions,

admissions, and any other acceptable materials, together with the affidavits or

declarations, if any, show that there is no genuine dispute as to any material fact

and that a decision may be rendered as a matter of law."  Rule 121(b); Sundstrand

Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir.

1994).  The moving party bears the burden of proving the absence of any genuine

issue of material fact, and factual inferences are drawn in a manner most favorable

to the party opposing summary judgment.  See Craig v. Commissioner, 119 T.C. at

260.  If there exists any reasonable doubt as to the facts at issue, the motion must

be denied.  Sundstrand Corp. v. Commissioner, 98 T.C. at 520.

II.   Danielson Rule and Transfers of Intellectual Property

First, we address the interplay between the Danielson rule, articulated in

Commissioner v. Danielson, 378 F.2d 771, 775 (3d Cir. 1967), vacating and

**[*13]** <u>remanding</u> 44 T.C. 549 (1965), and transfers of intellectual property. Because these cases are appealable to the U.S. Court of Appeals for the Third Circuit absent a stipulation of the parties to the contrary, we follow the precedent of that court. <u>Golsen v. Commissioner</u>, 54 T.C. 742, 757 (1970), <u>aff'd</u>, 445 F.2d 985 (1971).

Respondent's primary argument is that we should hold petitioners liable for the Federal income tax deficiencies solely on the reading of the contracts between Janssen, Mylan, and Forest under the <u>Danielson</u> rule.

Petitioners cite two cases decided by the Court of Appeals for the Third Circuit, <u>Merck & Co. v. Smith</u>, 261 F.2d 162 (3d Cir. 1958), and <u>E.I. du Pont de Nemours & Co. v. United States</u>, 432 F.2d 1052 (3d Cir. 1970), in which the Court of Appeals held that the transfer of all substantial rights in a patent can result in a disposition for tax purposes qualifying the transferor for capital gains tax treatment while a transfer of anything less is called a license, with proceeds taxed at ordinary income tax rates. In both cases the Court of Appeals examined not only the terms of the contracts but also the intent of the parties and found that all substantial rights were transferred. On the basis of these two cases, petitioners invite us to decline to follow the <u>Danielson</u> holding in the current cases. For the

**[*14]** reasons set forth below, we see Merck and E.I. du Pont de Nemours as consistent or compatible with the Danielson rule.

First, we examine the history and the facts of all three cases. The taxpayers in Danielson sought to reform the terms of the contract they had entered into to allocate the consideration between the price of the stock and the covenant not to compete differently. In the Tax Court Opinion, this Court stated that it was not bound by the form of the transaction and should examine its substance instead. Danielson v. Commissioner, 44 T.C. at 555-556 (citing Commissioner v. Court Holding Co., 324 U.S. 331 (1945), and Gregory v. Helvering, 293 U.S. 465 (1935)). At the same time, the Court acknowledged that it did not take the terms of the agreements lightly. Id. at 556. The Court then analyzed the contract at issue in the light of the surrounding facts and held that the taxpayers had produced the "strong proof" necessary to establish that the contractual allocation of the purchase price did not reflect the agreement entered into by the parties. Id.

On appeal, the Court of Appeals rejected the Tax Court's reasoning and adopted the following rule of law: "[A] party can challenge the tax consequences of his agreement as construed by the Commissioner only by adducing proof which in an action between the parties to the agreement would be admissible to alter that construction or to show its unenforceability because of mistake, undue influence,

[*15] fraud, duress, etc." Commissioner v. Danielson, 378 F.2d at 775. The Court of Appeals reasoned that the trial courts are required to examine the substance of a transaction in cases where the Commissioner attacks the formal agreement. Id. at 774-775 (citing Commissioner v. Court Holding Co., 324 U.S. 331, and Gregory v. Helvering, 293 U.S. 465). At the same time, because taxpayers can control what arrangements to make in the first place, there is no disparity in allowing only the Commissioner to challenge the contract while requiring taxpayers to be bound by the terms of their agreements. Id. at 775. Among the reasons cited in support of the new rule, the Court of Appeals stated that taxpayers' attacks on their own agreements "would nullify the reasonably predictable tax consequences of the agreement to the other party" and the Commissioner would be forced to litigate against both parties to the agreement to collect taxes properly due. Id.

The second line of cases deals with interpretation of contracts related to intellectual property. In Merck, a pre-Danielson case, the same Court of Appeals held that a transfer of all of the substantial rights in a patent would qualify the transferor for capital gains treatment, but a transfer of anything less is called a license, with the proceeds subject to ordinary income tax rates. Merck, 261 F.2d at 164. The court noted that the terms of the agreement between the parties did not preclude the taxpayer from claiming that the transaction was anything more

[*16] than a license.  Id.  The contract between the parties was drafted as a license but transferred the exclusive rights to make, use, and sell one of the claims for a chemical compound within a patent.  The Court of Appeals concluded that such an agreement, despite being structured by the parties as a license, in fact was an assignment of a patent which would qualify as a disposition of intangible property for tax purposes.  Id. at 165.

Another case, E.I. du Pont de Nemours, was decided post-Danielson and dealt with an issue similar to that in Merck:  whether a license agreement assigning rights in certain patents should be treated as a disposition for tax purposes.  In that case the parties to the license agreement chose a specific legal form for their arrangement because of Brazil's antitrust regulations.  The Court of Appeals applied the same test it had used in Merck to the facts in E.I. du Pont de Nemours, but clarified that to determine whether the parties transferred all of the substantial rights, the court should look at whether the transferor retained any rights which, in the aggregate, have substantial value.  E.I. du Pont de Nemours, 432 F.2d at 1055.  The Court of Appeals then determined that the agreement between the parties should be interpreted as a transfer qualifying for capital gains treatment.  Id. at 1055-1058.  The court further stated that the wording and precise

**[*17]** terms of the agreements did not control the outcome so long as the agreement transferred exclusive rights for the full life of the patent. Id. at 1055.

Petitioners urge us to apply the holdings of Merck and E.I. du Pont de Nemours in the current cases. Respondent argues that these holdings are inconsistent with the holding in Danielson, as well as the holding of Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co., 417 U.S.134, 149 (1974) (affirming the principle that "while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not"). Respondent suggests we should forgo the analysis outlined in Merck and E.I. du Pont de Nemours and decide these cases on the plain language of the contract under Danielson.

We do not see the inconsistency here. In Danielson, a taxpayer sought to change the tax consequences of a transaction by challenging the validity of the underlying contract's terms, specifically, allocation of consideration between the sale of stock and the covenant not to compete, because the taxpayer believed these terms did not reflect the agreement of the parties. In Merck and E.I. du Pont de Nemours the taxpayers did not seek to alter or challenge the agreements in question. Instead, the taxpayers disagreed with the Commissioner's interpretation of those contracts and characterization of the related payments for tax purposes.

**[\*18]** Here, unlike in <u>Danielson</u>, petitioners do not seek to change the tax consequences of the transaction by challenging the underlying agreements and reforming the contractual terms.[2] On the record before us, the facts here resemble those in <u>Merck</u> and <u>E.I. du Pont de Nemours</u>.[3] The question presented here is a question of proper tax characterization of the proceeds of valid and enforceable

---

[2]When this Court was presented with similar arguments in <u>Strutzel v. Commissioner</u>, 60 T.C. 969, 976 (1973), the Court declined to follow the rule articulated in <u>Commissioner v. Danielson</u>, 378 F.2d 771 (3d Cir. 1967), <u>vacating and remanding</u> 44 T.C. 549 (1965), and explained as follows:

> The short answer to both of the above arguments is that neither the petitioners nor this Court is attempting to vary the terms of the written agreement; we are simply trying to determine the tax consequences that flow from the agreement entered into by the parties. In doing so we are not bound by the descriptive terminology used in the agreement if the clear substantive purport of the agreement, viewed as a whole, classifies the transaction differently than the labels used by the draftsman.
> \* \* \*

[3]We note that <u>Merck & Co. v. Smith</u>, 261 F.2d 162 (3d Cir. 1958), and <u>E.I. du Pont de Nemours & Co. v. United States</u>, 432 F.2d 1052 (3d Cir. 1970), are factually different from the cases here because the issue the Court of Appeals addressed was whether a license contract in fact was an assignment of patent rights giving rise to capital gains treatment of the proceeds. Here, we are dealing with a transfer of rights in a license. Consequently, these cases are persuasive for us but not binding under the <u>Golsen</u> rule. <u>See</u> <u>Golsen v. Commissioner</u>, 54 T.C. 742, 756 (1970), <u>aff'd</u>, 445 F.2d 985 (10th Cir. 1971).

[*19] contracts, and we are mindful that the Commissioner and taxpayers often disagree on this issue.[4]

Thus, bearing in mind the weight of the principles articulated in Danielson and Nat'l Alfalfa Dehydrating & Milling Co., we decide first whether interpretation of the contracts in question precludes the finding that, contrary to respondent's argument, there was a disposition of property taxable as capital gains.[5] In that regard, we find the reasoning of the Court of Appeals in Merck and E.I. du Pont de Nemours persuasive, and we will use similar principles in considering this motion for summary judgment.

III.    Contract Interpretation Principles

The law of the State of New York, which governs the 2006 agreement and the 2008 amendment, suggests the following principles applicable to contract interpretation and construction. Under New York law, the cardinal rule in the interpretation of contracts is that courts should ascertain the intent of the parties

---

[4]To draw a parallel to taxation of real property transactions, we are dealing with the issue similar to whether the agreements as drafted represent a sublease or a lease assignment. See, e.g., Rochester Dev. Corp. v. Commissioner, T.C. Memo. 1977-307 (holding that a lease in form was actually a sale for income tax purposes).

[5]This Court has previously held that the sale of all the rights a taxpayer held in a patent license may qualify for capital gains treatment. MacDonald v. Commissioner, 55 T.C. 840, 859 (1971).

[*20] and give effect to it.  See, e.g., Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002).  When parties set down their agreement in a clear, complete, and unambiguous document, their writing should be enforced according to the plain meaning of its terms.  See id.; R/S Assocs. v. New York Job Dev. Auth., 771 N.E.2d 240, 242 (N.Y. 2002).  When a contract is unambiguous, no extrinsic evidence may be considered, and the interpretation of a contract presents a question of law.  Greenfield, 780 N.E.2d at 170.  However, if the contract is ambiguous or susceptible of more than one construction, courts may consider extrinsic evidence to ascertain the intent of the parties, see id., which may present a court with a question of fact inappropriate to be resolved on a motion for summary judgment, Leon v. Lukash, 504 N.Y.S.2d 455, 455 (App. Div. 1986).

IV.    Analysis of the 2006 Agreement and the 2008 Amendment

The parties in these cases do not dispute that the 2006 agreement between Mylan and Forest was a grant of a sublicense to the license rights Mylan had under the 2001 agreement with Janssen.  However, the parties dispute the effect of the 2008 amendment.

Respondent took the position in the notice of deficiency and on brief that the proceeds Mylan received under the 2008 amendment should be characterized as royalties for the use of the sublicense taxed at ordinary income tax rates.  On the

[*21] basis of the plain language of the agreements, respondent argues that there was no disposition of licensing rights under the 2008 amendment, and its effect was just to accelerate license fees and royalty payments.

Petitioners, in turn, argue that although the 2006 agreement was a grant of a sublicense to Forest, the effect of the 2008 amendment was to terminate Mylan's commercial rights in nebivolol and transfer them to Forest. Petitioners contend that Mylan retained only certain ministerial functions under the 2008 amendment related to performance of its obligations under the 2001 agreement with Janssen. Thus, petitioners argue, there was a disposition of intellectual property which should qualify for capital gains treatment because Mylan sold substantially all of its rights in nebivolol under the 2001 agreement.

As a preliminary matter, we observe that the 2001 agreement did not preclude Mylan's completely disposing of its rights in nebivolol by assigning those rights to a third party.

We agree with the parties that the 2006 agreement was a grant of a sublicense. Many factors support this conclusion. First, the parties to the 2006 agreement chose to structure it as a grant of an "exclusive sublicense" to Forest. Second, Mylan obtained a written consent from Janssen to a grant of the sublicense under the 2001 agreement, not an assignment. Mylan retained

[*22] significant rights related to nebivolol, including the right to participate in the joint development committee and control major decisions related to the commercial use of nebivolol. Mylan remained responsible for purchasing the compound from Janssen, importing it, and making all of the required payments under the 2001 agreement. Mylan was also responsible for production of the nebivolol-containing products in the United States and Canada during the period necessary for Forest to get its own production facilities up and running.

Another important factor that indicates that the 2006 agreement was a sublicense, not an assignment, is the term of the agreement and termination provisions. While the original license to nebivolol under the 2001 agreement expired only when the last of the patents under the license expired, the 2006 agreement was to remain in effect until Mylan and Forest ceased to sell, develop and commercialize nebivolol-containing products in the United States or Canada. Forest retained a right to terminate the 2006 agreement at any time if it reasonably believed that safety or efficacy issues were likely to negatively affect regulatory approvals or commercial use of the nebivolol-containing products.

Overall, the 2006 agreement seems to be a product of careful negotiations between Mylan and Forest and is consistent with the intent of the parties at the time as described in petitioners' filings. The 2008 closing agreements between

**[\*23]** Mylan and the IRS also seem to be consistent with this interpretation because they defer inclusion in income of payments from Forest as payments for the use (including under a license) of intellectual property.[6]

Our reading of the 2008 amendment, however, paints a different picture. Respondent suggests that we ignore any extrinsic evidence and interpret the 2008 amendment by looking only at its plain language. Respondent argues that because Mylan and Forest, two publicly traded corporations, did not structure the 2008 amendment as an assignment or disposition of license rights and did not request additional approvals for such an assignment from Janssen, they must have intended the transaction to merely accelerate the payments under the 2006 agreement without changing its nature as a sublicense.

Petitioners' arguments, however, point us to a conclusion that the 2008 amendment is not so unambiguous as respondent wants us to think. First, petitioners point out in their briefs and affidavits filed in support thereof that in the pharmaceutical industry terms such as "exclusive license" or "exclusive sublicense" often indicate a disposition of intellectual property when coupled with

---

[6]We note that the 2008 closing agreements between Mylan and the IRS covered only two payments received by Mylan under 2006 agreement: the $75 million upfront payment and a $25 million hypertension treatment approval payment.

**[\*24]** a transfer of substantially all rights in such property. See, e.g., E.I. du Pont de Nemours, 432 F.2d 1052; Merck, 261 F.2d 162. We also observe that the 2008 amendment indeed transferred additional rights to nebivolol to Forest, to the exclusion of Mylan. This makes the 2006 agreement, as amended, ambiguous on its face because the plain language of the contract is susceptible to more than one interpretation. See Greenfield, 780 N.E. 2d at 170.

When the terms of a contract are ambiguous, we look to extrinsic evidence to ascertain the intent of the parties. See id. Here, we interpret the facts in the light favorable to petitioners as the party opposing the motion for summary judgment. See Craig v. Commissioner, 119 T.C. at 260. Petitioners state that by the time of the 2008 amendment, Mylan had significant business reasons to sell its rights in nebivolol. Specifically, Mylan needed cash after acquiring another company and wanted to limit its risk with respect to the future success of nebivolol. Both Mylan and Forest indicated in their press releases and the filings with the SEC that Mylan's commercial rights with respect to nebivolol were terminated by the 2008 amendment.

Petitioner also asserts that any remaining rights Mylan may have had under the 2006 agreement, as amended, were of no substantial value to Mylan, thus satisfying the test for a disposition outlined by the Court of Appeals in E.I. du Pont

**[*25]** <u>de Nemours</u>. There are, however, many unanswered questions that preclude resolving the issue of whether Mylan disposed of its rights in nebivolol in 2008 or in 2012 when Janssen, Forest, and Mylan executed the termination agreement with respect to the 2001 agreement and 2006 agreement, as amended. Because there are substantial unresolved questions of fact in these cases, respondent's motion for summary judgment will be denied.

V.  <u>Conclusion</u>

For the reasons set forth above, respondent's motion will be denied.

<u>An appropriate order will be issued</u>.